**EOD**

02/28/2021

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HOPE RENEE KEESE** | § | Case No. 18-40817 |
| xxx-xx-0192 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| THE BARBKNECHT FIRM, P.C. | § | |
| | § | |
| | § | |
| Plaintiff | § | |
| and Counter-Defendant | § | |
| | § | |
| v. | § | Adversary No. 18-4057 |
| | § | |
| HOPE RENEE KEESE | § | |
| | § | |
| Defendant | § | |
| and Counter-Plaintiff | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Upon trial of the fourth amended complaint filed by the Plaintiff, The Barbknecht

Firm, P.C. seeking to deny the entry of a Chapter 7 discharge in favor of the Debtor-

Defendant, Hope Renee Keese, pursuant to 11 U.S.C §§ 727(a)(2)(A) and (a)(2)(B) or,

alternatively, seeking a determination of whether an alleged debt owed to it by the

Debtor-Defendant should be excepted from discharge pursuant to 11 U.S.C.

§ 523(a)(2)(A) and/or 11 U.S.C. § 523(a)(4), the Court issues the following findings of

fact and conclusions of law.  This memorandum disposes of all issues pending before the

Court.

# FINDINGS OF FACT

1.  The Defendant, Hope Renee Keese, is an individual residing in Plano, Collin County, Texas.[1]

2.  The Plaintiff is a law firm in Plano, Texas, through which Joseph Barbknecht ("Barbknecht") conducts his law practice.  Barbknecht is the owner and sole member of such law firm.[2]

3.  Barbknecht has practiced law for more than 36 years and is licensed to practice in three states and the District of Columbia.

4.  In February 2016, the Defendant hired the Plaintiff to represent her in a divorce from her ex-husband, Corey Keese.[3]

5.  On or about February 10, 2016, the Defendant and the Plaintiff executed an agreement entitled "*Agreement for Employment and Power of Attorney*" (the "Original Fee Agreement").[4]

6.  At that time, the Defendant paid the Plaintiff $3,000.00 as a retainer for the Plaintiff's legal services.[5]   That amount was paid by credit card.

7.  The Original Fee Agreement provided, *inter alia*, that:

---

[1]  MSJ Established Fact #1.  Through the Court's consideration of competing motions for summary judgment filed by the parties, pursuant to the operation of FED. R. CIV. P. 56(e) and E.D. TEX. LOCAL R. CV–56(a)-(b), as incorporated by BANKR. E.D. TEX. LOCAL R. 7056, the Court determined that a number of material facts set forth as undisputed in the respective motions had not been controverted at all by the parties or that any such challenge thereto had not been supported by references to proper summary judgment evidence and, therefore, had been "admitted to exist without controversy."  E.D. TEX. LOCAL R. CV–56(c).  Such facts were denominated in the orders resolving the respective summary judgment motions and treated as established in this case pursuant to FED. R. CIV. P. 56(g).  Each such fact shall be referenced herein as "MSJ Established Fact #x."

[2]  MSJ Established Fact #2.  In these findings and conclusions, the law firm is referenced as the Plaintiff and the individual attorney is referenced as "Barbknecht."

[3]  MSJ Established Fact #3.

[4]  Ex. 3.  MSJ Established Fact #4.

[5]  MSJ Established Fact #5.

(a)     attorney time would be billed at rates from $275 to $525 an hour;

(b)     Attorney Barbknecht's rate for the matter was going to be $425 per hour;

(c)     the $3,000 retainer would be placed in the Plaintiff's trust account and that if the Defendant failed to timely pay an invoice, then the Plaintiff would withdraw money from the retainer to be applied against the outstanding amount;

(d)     in the event that the retainer was depleted, the Defendant would be required to restore the retainer to the $3,000 level; and

(e)     the Defendant's failure to pay for services rendered would be grounds for the Plaintiff to terminate its representation of her and withdraw as her attorney.[6]

8.     When the Defendant signed the Original Fee Agreement she represented and communicated both verbally and in writing that she would pay the Plaintiff's fees.[7]

9.     The divorce case was initiated in February 2016 in the 470th Judicial District Court of Collin County, Texas, styled *In the Matter of the Marriage of Hope Renee Keese and Corey Michael Keese*, Case No. 470-50864-2016 (the "Divorce Case").[8]

10.     In the initial stages of the divorce case, the parties thought that the divorce case would proceed quickly without a great deal of animosity,[9] thereby holding the accrual of fees to a minimum.

11.     The first fee invoice from the Plaintiff to the Defendant virtually exhausted the $3,000 retainer.[10]

---

[6] MSJ Established Fact #6.

[7] MSJ Established Fact #7.

[8] MSJ Established Fact #8.

[9] Indeed the divorcing spouses continued to live under the same roof, at least sporadically, through the first few months of the Divorce Case.

[10] Ex. 4 at 2.

12.    The second fee invoice from the Plaintiff to the Defendant totaled $9,536.21 and reflected the application of the remaining $196.29 of the retainer and the remainder thereafter remained unpaid by the Defendant.[11]

13.    In fact, the $3,000 initial retainer paid by the Defendant was the only payment that the Defendant ever made to the Plaintiff.[12]

14.    Thus, soon after the Divorce Case was initiated, the Defendant defaulted on her payment obligations to the Plaintiff for accrued attorneys' fees.[13]

15.    In June 2016, the hope for a simpler, friendlier divorce dissipated at a temporary orders hearing when serious accusations regarding misbehavior and parental fitness were made against the Defendant by her husband.

16.    This myriad of issues complicated the Divorce Case which increased the number of attorney services required to be rendered.  These issues included:

    (a)    the Defendant's sexual impropriety and her misrepresentations about that issue to her counsel, the Plaintiff;

    (b)    the Defendant's desire to achieve limited visitation and limited custody rights for her ex-husband;

    (c)    accusations of adultery by and against the Defendant and her ex-spouse;

    (d)    false allegations by the Defendant's ex-mother-in-law to the Defendant's employer.[14]

17.    These developments occurred at a time in which the Defendant was already in arrears to the Plaintiff on accrued fees.

---

[11]  *Id*. at 5.

[12]   Though admittedly considered in the light of numerous facts established through the summary judgment process, this is the sole statement of fact to which the parties agreed to stipulate in the approved Joint Pre-Trial Order entered in this adversary proceeding on October 27, 2020 [dkt. #102].

[13]  MSJ Established Fact #9.

[14]  MSJ Established Fact #29.

18.     In response to the payment default, the Plaintiff intended to terminate its
        representation of the Defendant and withdraw as her attorney of record in the
        Divorce Case.[15]

19.     The Defendant wanted to retain the Plaintiff as her attorney in the Divorce Case.[16]

20.     In response, beginning around mid-June, 2016, the Plaintiff sought assurances
        from the Defendant that she would pay its accruing fees and costs in light of the
        case growing in size and complexity.[17]

21.     The Defendant invited the Plaintiff to rely on the money that she anticipated to
        receive from the sale of her house and the receipt of a portion of her ex-husband's
        pension plan as assurance for her ability to pay the Plaintiff's fees and costs.[18]

22.     Barbknecht had previously advised the Defendant in May 2016 that she would
        likely incur adverse tax consequences should she decide to liquidate any portion of
        the retirement funds that she might receive from her soon-to-be ex-spouse's
        pension plan in order to pay expenses.[19]

---

[15] MSJ Established Fact #10.

[16] MSJ Established Fact #12.

[17] MSJ Established Fact #11.

[18] MSJ Established Fact #13.

[19] MSJ Established Fact #14.  In May 2016, in response to the Defendant's e-mail inquiry
regarding her prospective use of the retirement funds for other purposes, Barbknecht responded as
follows:

> The retirement accounts will have to be examined rather carefully before addressing any
> withdrawls (sic).  Yours may prevent such until actual retirement[.]  [Y]ou may need to
> check that.  The same goes with Corey's retirement account.  You will need to investigate
> this.
>
> When you check on this, pay particular attention to taxes and penalties which might be
> imposed on a withdrawl (sic) from a retirement account.  Please investigate these funds in
> the near term as they will be important in our settlement of your property interests.  You
> should know the rule etc. inside and out.
>
> Here is an example:  I had an ex employee (sic) liquidate his retirement account that had
> been set up via the firm.  It was set up with pre tax dollars.  When he cashed it in, the IRS

23.     Barbknecht gave similar advice to the Defendant before she executed the
Supplemental Fee Agreement.[20]

24.     When the Defendant agreed to pay the Plaintiff's fees and expenses from the
proceeds of her anticipated divorce settlement, such was the only source of funds
that she had available to her to pay its fee.[21]

25.     Indeed, the assets designated in the Supplemental Fee Agreement constituted the
only source of funds that the Defendant had available to pay the approximate
$9,500 that she owed the Plaintiff for accrued fees at the end of June 2016.[22]

26.     The July 27, 2016 invoice illustrated the growing problem.  The services billed by
the Plaintiff in that month totaled $11,057 and increased the overall accrued fees to
$20,593.71.[23]

27.     Accordingly, on or about August 18, 2016, the Defendant and the Plaintiff entered
into a supplemental fee agreement (the "Supplemental Fee Agreement"), which
acknowledges the Defendant's default under the Fee Agreement and provides the
following:

> Hope Renee Keese desires that The Barbknecht Firm P.C.
> continue to represent her through the conclusion of the above-
> captioned matter. As consideration for doing so Hope Keese
> agrees that any monies coming to her from any source within
> this captioned case or from outside the case regardless of

---

took nearly 40% off the top.  Not a wise move.

I have no certainty as to how Yours and Corey's work, but know before you withdraw as
to penalties and taxes as they can be huge to the point of taking those funds off the board
for all practical purposes.  As mentioned above[,] in the near term[,] you need to be very
comfortable with the rules on your account and his. . . .

Ex. 12.

[20] MSJ Established Fact #15.

[21] MSJ Established Fact #16.

[22] Ex. 4 at 5.  MSJ Established Fact #17.

[23] Ex. 4 at 8.

source will be first applied to the payment of fees, interest, expenses, and costs incurred by The Barbknecht Firm p.c. (sic) in consideration for The Barbknecht Firm P.C. continuing to represent Hope Keese.

Ms. Keese will liquidate any interest she is awarded or becomes entitled to in Mr. Corey Keese's profit sharing pension plan within 5 business days for an award or settlement turning such funds legally over to her and shall pay any and all bills that such amount may cover with the Barbknecht Firm p.c. (sic).

Ms. Keese will pay to The Barbknecht Firm p.c. (sic) first in time, the funds which she receives or is awarded from the sale of 1622 Geneieve (sic) Drive Wylie Tx. 75098 and or funds payable to her from Mr. Corey Keese toward satisfying attorney fees, interest, costs, and expenses in this matter and any other matter for which The Barbknecht Firm pc (sic) Is (sic) her counsel.[24]

28.   By signing the Supplemental Fee Agreement, the Defendant again represented and communicated her intention to pay the Plaintiff's fees.[25]

29.   Throughout the Divorce Case, the Plaintiff generated monthly invoices which itemized attorneys' fees and expenses incurred to date.[26]

30.   The Defendant has admitted her receipt of these invoices as they were generated.[27]

31.   Despite her receipt of those monthly invoices, the Defendant never instructed the Plaintiff to cease its activities or to limit the time that it spent on her case.[28]

---

[24]  Ex. 5.  MSJ Established Fact #18.

[25]  MSJ Established Fact #19.

[26]  MSJ Established Fact #25.

[27]  MSJ Established Fact #26.

[28]  MSJ Established Fact #27.

32.  Fees continued to accrue at a significant rate.  By the end of calendar year 2016, the invoiced amounts totaled over $40,000.[29]

33.  On March 1, 2017, the parties engaged in a successful daylong mediation of the outstanding disputed issues in the Divorce Case, involving significant preparation and participation time by the Plaintiff.[30]

34.  Through April 7, 2017, the attorneys' fees billed by the Plaintiff had risen to $73,751.01.[31]

35.  Significant services were required to be rendered in the succeeding months in attempts to process the mediated settlement into final orders.

36.  An Agreed Decree of Divorce was signed in the Divorce Case on May 26, 2017.

37.  The Defendant and her ex-spouse subsequently reached an agreement whereby the Defendant would abandon her interest in the homestead in favor of a larger award from her ex-husband's retirement plan.

38.  In mid-August 2017, the Defendant convinced the Plaintiff to allow the transfer of the pension plan award directly to her rather than having any portion paid directly to the Plaintiff for its fees or otherwise having the awarded funds paid jointly to both the Defendant and to the Plaintiff.[32]

39.  On August 29, 2017, the presiding judge in the Divorce Case signed an *Agreed Order Modifying Agreed Decree of Divorce* (the "Modified Divorce Decree") that, among other things, awarded to the Defendant $182,094.00 as her portion of her ex-husband's retirement benefits in the retirement plan sponsored by his employer, Ingersoll-Rand Company.[33]

---

[29]  Ex. 4 at 19.

[30]  Ex. 31.

[31]  *Id*. at 24.

[32]  MSJ Established Fact #20.

[33]  Ex. 15.  MSJ Established Fact #21.

40.  The presiding judge also signed on August 29, 2017, a *First Amended Qualified Domestic Relations Order* ("QDRO") to facilitate the transfer of the designated Retirement Funds to the Defendant as a division of marital property in an attempt to maintain the status of such funds as a recognized, qualified tax-deferred retirement account under all applicable federal, state, and local tax and other laws.[34]

41.  In response to the entry of these orders, Barbknecht wrote to the Defendant:

> Yesterday we got the judge to sign both the Modified QDRO and the Modified Decree. . . .  We will now be awaiting the sending of the funds.  They may come to you[.] [T]hey may come to me.
>
> Either way I would like to complete the payment of our account with you upon receipt of the check so I will let you know and if you would in turn do so on the day upon which it arrives.  This could take as long as a few months or as short as a few weeks.
>
> At any rate this appears to be a good break through (sic) and a step toward ending the litigation, which is a truly good thing for one and all.
>
> So very happy for you.[35]

42.  As evidenced by the invoices, $94,723.57 had been incurred by September 19, 2017, only a few weeks after the entry of the Modified Divorce Decree.[36]

43.  Surprisingly, however, there would be no delivery of a check to either party.

---

[34]  Ex. 16.  MSJ Established Fact #22.  "A QDRO is a limited exception to the pension plan anti-alienation provision and allows courts to recognize a nonparticipant spouse's community property interest in pension plans under specific circumstances." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997).  "The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during their retirement as a means of income."  *Id.* at 854.

[35]  Ex. 26.

[36]  MSJ Established Fact #28.

44.   In response to the entry of the QDRO, the Ingersoll-Rand Company Employee
Savings Plan established and maintained a QDRO retirement account in the name
of the Defendant in the principal amount of $182,094.00 through Fidelity
Investments which was invested in a "default fund" entitled Vanguard Target
Retirement 2045 Trust Plus (the "QDRO Retirement Account").[37]

45.   The $182,094.00 awarded to the Defendant in the form of the QDRO Retirement
Account, representing her marital interests in her husband's retirement funds, was
the only property that the Defendant received in the Modified Divorce Decree.[38]

46.   The record is unclear as to when the Defendant learned that the administrator of
the Ingersoll-Rand Company Employee Savings Plan had established a new
account in that Plan in the Defendant's own name.

47.   What is crystal clear is that this development was unknown to Barbknecht.

48.   On or about November 7, 2017, Barbknecht called to ask the Defendant what the
status of the payment was and the Defendant told Barbknecht that she had not yet
received the divorce proceeds.[39]

49.   On December 28, 2017, the Plaintiff forwarded to the Defendant a statement for its
fees and expenses incurred to date, to which the Defendant responded, "I do not
have access to the money yet, but I most certainly will pay when it is available to
me.  Thank you."[40]

50.   On January 18, 2018, the Plaintiff confirmed with the payor of the pension plan
proceeds that the funds had been made available to the Defendant for some time
and that the Defendant's denials that she had received the funds were false.[41]

51.   When confronted about the earlier transmittal of pension plan funds to her, the

---

[37] MSJ Established Fact #23.

[38] MSJ Established Fact #24.

[39] MSJ Established Fact #30.

[40] Ex. 32.  MSJ Established Fact #31.

[41] MSJ Established Fact #32.

Defendant confirmed that she had received control of the retirement funds.[42]

52.     Because of the size of the Plaintiff's fees, the Defendant sought a reduction of those fees and offered to pay a reduced amount, including payment offers submitted through Larry Levick, a bankruptcy attorney with whom she was consulting at the time due to her financial condition and the Plaintiff's demands.[43]

53.     The Plaintiff did not accept the Defendant's settlement offers and would not reduce the amount of fees it was claiming from the Defendant (representing 59% of the amount she received in the Divorce Case even before the payment of income taxes for withdrawing retirement funds) and insisted upon being paid at least $104,000.00.[44]

54.     The Plaintiff sent a series of demand letters to the Defendant claiming an ownership interest in the retirement funds and threatening, among other things, criminal prosecution of the Defendant if she failed to pay the Plaintiff's fees from the pension plan proceeds.[45]

55.     In response thereto, the parties appeared poised to settle the attorney's fee dispute in January 2018 and the Defendant took steps to access a significant portion of the retirement funds she had received in the Divorce Case.

56.     On February 5, 2018, the Ingersoll Rand Company Employee Savings Plan made a partial distribution from the Defendant's QDRO Retirement Account to the Defendant based upon the Defendant's instruction for a distribution that would provide a net payment of $100,000 to her.[46]

57.     The pension plan withheld the sum of $47,058.83 for taxes which was forwarded to the Internal Revenue Service.[47]

---

[42] MSJ Established Fact #33.

[43] MSJ Established Fact #34.

[44] MSJ Established Fact #35.

[45] MSJ Established Fact #36.

[46] MSJ Established Fact #37.

[47] MSJ Established Fact #38.

58.     The net sum of $100,000.00 was tendered to the Defendant by check.[48]

59.     The proposed settlement was not consummated for reasons unspecified in the record.

60.     The Defendant did not deposit the $100,000.00 check into her general bank account.[49]

61.     Instead, on March 30, 2018, the Defendant deposited the $100,000.00 check to fund a new individual retirement account with Fidelity Investments.  Fidelity Management Trust Co. is the Custodian of the Defendant's IRA account.[50]

62.     The creation of that new IRA account was accomplished within the 60-day rollover period applicable to transfers of tax-deferred retirement accounts.

63.     The Defendant has maintained such IRA continuously since its creation on March 30, 2018, and has not withdrawn any funds from such IRA account.[51]

64.     Other creditors began to take legal actions against the Defendant on various financial obligations:

        (a)     On February 28, 2018, Discover Bank obtained a summary judgment against the Defendant for the judgment amount of $18,566.42;[52]

        (b)     On March 23, 2018, a default judgment against the Defendant was rendered in favor of Bank of America, N.A. in the amount of $13,495.37;[53] and

        (c)     On April 2, 2018, the Defendant was sued by Synchony Bank to recover the sum of $1,050.96.[54]

---

[48] MSJ Established Fact #39.

[49] MSJ Established Fact #40.

[50] Ex. 6.  MSJ Established Fact #41.

[51] MSJ Established Fact #42.

[52] Ex. 9.  MSJ Established Fact #43.

[53] Ex. 8.  MSJ Established Fact #43.

[54] Ex. 10.  MSJ Established Fact #43.

65.     On March 26, 2018, the Plaintiff initiated a state court lawsuit against the Defendant to recover the unpaid attorneys' fees in an action filed before the 296th Judicial District Court in and for Collin County, Texas.[55]

66.     On or about April 29, 2018, the Defendant filed a voluntary petition for bankruptcy relief under Chapter 7 of the United States Bankruptcy Code.[56]

67.     In conjunction with her Voluntary Petition, the Debtor filed her Schedules and Statement of Financial Affairs in her Chapter 7 case.[57]

68.     The Plaintiff filed Proof of Claim #7-1 in the Defendant's bankruptcy case in the amount of $182,094.00 for representing the Defendant in her Divorce Case.[58]

69.     The amount claimed by the Plaintiff in its Proof of Claim is for the entire value of the QDRO Retirement Account, which is the only property that the Defendant received in her Divorce Case.[59]

70.     The Plaintiff timely filed its original Plaintiff's Adversary Complaint on June 13, 2018, seeking to deny the entry of a discharge to the Debtor-Defendant under § 727(a)(2)(A) or, alternatively, to except the Plaintiff's claim from the scope of any discharge granted to the Defendant as a debt procured by false representation, false pretenses, or actual fraud under § 523(a)(2)(A) of the Bankruptcy Code or as a debt arising from a larceny under § 523(a)(4) of the Bankruptcy Code.

71.     The operative complaint is now the Plaintiff's Fourth Amended Complaint which mirrors the above-stated causes of action and which, with leave of court, added a count for denial of the Defendant's discharge under § 727(a)(2)(B) arising from

---

[55] MSJ Established Fact #44.

[56] MSJ Established Fact #47.

[57] MSJ Established Fact #48.   *Schedules, Statement of Financial Affairs, and Other Required Statements* filed by the Debtor-Defendant on April 20, 2018 [dkt #1] in case no. 18-40817.   *See also* Ex. 24 [*Amended Schedules A, B, & C*] filed by the Debtor-Defendant on August 30, 2018 [dkt #25] in the same case.

[58] MSJ Established Fact #49.   *Proof of Claim #7-1* filed by The Barbknecht Firm, P.C. on June 12, 2019 in case no. 18-40817.

[59] MSJ Established Fact #50.

her acquisition and disposition of a tax refund which the Plaintiff contends was an unauthorized acquisition and transfer of property of the bankruptcy estate.[60]

72.    In conjunction with her answer to the then-pending complaint, the Defendant also filed a counterclaim against the Plaintiff, claiming that the "Plaintiff breached its fiduciary duties to Defendant for an improper purpose and to gain an improper benefit at the expense of and to the detriment of Defendant."[61]

73.    The Counterclaim further alleges that:

> To induce Defendant to engage Plaintiff as her attorney in the divorce proceedings, at the inception of the attorney-client relationship Plaintiff failed to adequately, fully, and completely disclose to Defendant the potential costs of Plaintiff's services and the amount of legal fees that she might incur in such proceeding if she retained Plaintiff as her attorney.  Such omission is especially egregious because Plaintiff knew (or should have known) at that time that Defendant did not have the financial means or income to pay significant attorney's fees (and certainly not attorney's fees exceeding $100,000 as claimed in this proceeding).[62]

74.    The Counterclaim further alleges that:

> More specifically, in violation of his fiduciary duties to its client, Plaintiff induced Defendant to agree to:  (a) liquidate within 5 business days whatever interests she might receive from her husband's profit sharing or pension plan and to pay Plaintiff's fees from such interests, and (b) pay to Plaintiff whatever funds Defendant might receive on account of any sale of the residential homestead that she and her husband owned should the property be sold in conjunction with the divorce proceeding.[63]

---

[60] Dkt #29 at 10 filed in this adversary on February 13, 2019.

[61] Dkt #78 filed in this adversary on June 20, 2020.

[62] *Id*. at 11.

[63] *Id*. at 12.

75. The Counterclaim alleges that, because of the Plaintiff's breach of its fiduciary duty to the Defendant arising from the attorney-client relationship, the Defendant seeks recovery of all actual damages, including the return of the $3,000 retainer paid to Plaintiff, as well as disgorgement and forfeiture of all attorney's fees which accrued, plus an award of exemplary damages.[64]

76. The Defendant also filed on the same date her *Defendant's Demand for Jury Trial on Defendant's Counterclaims Against Plaintiff*.[65]

77. The Plaintiff, acting as the Counter-Defendant, timely answered the allegations of the Counterclaim.[66]

78. In response to the Defendant's Counterclaim, this Court issued a *Notice to Chapter 7 Trustee Regarding Assertion of Cause of Action (Counterclaim)* on March 21, 2019, in which the Court advised Mark A. Weisbart, the duly-appointed Chapter 7 Trustee (the "Trustee"), of the filing of the Defendant's counterclaim and that "[t]his notification is provided to the Trustee for his evaluation of whether such counterclaim constitutes property of the bankruptcy estate in the above-referenced Chapter 7 case over which the Trustee would have exclusive ownership rights."[67]

79. In response to the Court's notice, the Trustee intervened in this adversary proceeding through the filing of a complaint which essentially mirrored the Defendant's Counterclaim and which sought judgment against the Plaintiff on the breach of fiduciary duty theory.[68]

80. On July 27, 2020, the Court denied a series of summary judgment motions regarding selected claims asserted by the parties but concluded that, pursuant to the operation of FED. R. CIV. P. 56(e) and E.D. TEX. LOCAL R. CV–56(a)-(b), as incorporated by BANKR. E.D. TEX. LOCAL R. 7056, a number of material facts set forth as undisputed in the respective motions had not been controverted at all by the parties or that any such challenge thereto had not been supported by references

---

[64] *Id*. at 17-18. The counterclaim also presents a claim for an award of attorney's fees under § 523(d) of the Bankruptcy Code and the Texas Theft Liability Act.

[65] Dkt #30 filed in this adversary on February 13, 2019.

[66] Dkt #31 filed in this adversary on March 6, 2019.

[67] Dkt #32 entered in this adversary on March 21, 2019.

[68] Dkt #43 filed in this adversary on May 23, 2019.

to proper summary judgment evidence and, therefore, had been "admitted to exist without controversy." E.D. TEX. LOCAL R. CV–56(c). Accordingly, such undisputed material facts were denominated in the orders resolving the respective summary judgment motions and treated as established in this case pursuant to FED. R. CIV. P. 56(g).

81.  The Defendant twice sought from the United States District Court a withdrawal of the reference for adjudication of her Counterclaim, claiming a right to a jury trial and questioning whether this Court possessed the constitutional authority to adjudicate the counterclaim.[69]

82.  Both motions for withdrawal of the reference as to the Counterclaim were denied by the District Court.[70]

83.  The Plaintiff's Fourth Amended Complaint was filed with leave of court on June 10, 2020.[71] It added a count under § 727(a)(2)(B) pertaining to the Debtor's alleged post-petition dissipation of a significant and unscheduled tax refund which constituted property of the bankruptcy estate.

84.  On the eve of trial, Mark A. Weisbart, the Chapter 7 Trustee, filed a *Trustee's Notice of Intent to Abandon Litigation Claims*, asserting that he "has determined these assets have no or nominal value to the bankruptcy estate."[72]

85.  An order approving the Trustee's abandonment of those litigation claims was entered by the Hon. Brenda T. Rhoades on November 16, 2020.[73]

86.  The Trustee thereafter dismissed his intervention complaint and withdrew from participation in the trial of this adversary proceeding.[74]

---

[69]  Dkts ##1 and 4 filed in District Court case no. 4:20-mc-00010-RWS (the "District Court Case") on January 17, 2020 and August 11, 2020, respectively.

[70]  Dkts ## 2 and 7 entered in the District Court Case on May 15, 2020 and October 20, 2020, respectively.

[71]  The Court also denied leave to the Plaintiff to add a count under § 727(a)(3) for an alleged failure of the debtor to preserve recorded information.

[72]  Dkt #42 filed on October 26, 2020 in bankruptcy case no. 18-40817.

[73]  Dkt #43 entered on November 16, 2020 in bankruptcy case no. 18-40817.

[74]  Dkt ## 111 and 116 filed in this adversary proceeding.

*Original Fee Agreement*

87.    The Original Fee Agreement[75] executed by the Plaintiff and the Defendant on February 10, 2016 constituted a valid contract between the parties.

88.    The Plaintiff tendered performance under the Original Fee Agreement by providing legal services to the Defendant in the Divorce Case.

89.    The Defendant breached her contractual obligations owing to the Plaintiff under the Original Fee Agreement by failing to render payment outlined in each respective invoice of the Plaintiff for the rendition of legal services.

90.    The Plaintiff suffered damages in the amount of $104,247.00 as a direct and proximate result of the Defendant's breaches of her obligations under the Original Fee Agreement.

91.    With the granting of relief on the Plaintiff's breach of contract, its alternative counts for recovery on a sworn account, quantum meruit, and money had and received are dismissed as moot.

92.    The Plaintiff failed to establish by a preponderance of the evidence that the indebtedness arising from the Original Fee Agreement was procured under circumstances constituting actual fraud.

93.    The Plaintiff failed to establish by a preponderance of the evidence that, at the time that the contract was formed, the Defendant was incapable of performing the obligations of the Original Fee Agreement as promised.

94.    The Plaintiff failed to establish by a preponderance of the evidence that, at the time of the contract was formed, the Defendant had no intention of performing the obligations under the Original Fee Agreement as promised.

95.    Indeed at the inception of the Original Fee Agreement, both sides anticipated that the Divorce Case would proceed quickly without a great deal of animosity and that fees would be minimalized.

96.    Had the parties foreseen the future, the retainer would likely have been much larger or, since he viewed his involvement at that stage as a favor for his wife's

---

[75] Ex. 3.

-17-

friend, Barbknecht might have passed on the representation entirely since the
financial resources generally available to a teacher would have significantly
increased the risk of nonpayment.

97.   The Plaintiff failed to establish by a preponderance of the evidence that the
      Defendant's representations of a willingness and ability to pay under the Original
      Fee Agreement were false.

98.   The Plaintiff failed to establish by a preponderance of the evidence that the
      Defendant made representations of a willingness and ability to pay under the
      Original Fee Agreement that the Defendant knew were false at the time that such
      representations were made.

99.   The Plaintiff failed to establish by a preponderance of the evidence that the
      Defendant otherwise made knowingly false representations to the Plaintiff
      regarding the Original Fee Agreement with the specific intention and purpose of
      deceiving the Plaintiff.

100.  The Plaintiff failed to establish by a preponderance of the evidence that it
      justifiably relied upon any false representation by the Defendant pertaining to the
      Original Fee Agreement since no such false representation was made to the
      Plaintiff.

101.  The Plaintiff failed to establish by a preponderance of the evidence that the
      Defendant induced the Plaintiff to provide legal services under the Original Fee
      Agreement with a fraudulent intent.

102.  The damages that the Plaintiff suffered arising from the Defendant's failure to pay
      the accrued attorney's fees under the Original Fee Agreement arose from a breach
      of contract, not from any tortious conduct committed by the Defendant.

*Supplemental Fee Agreement*

103.  In light of the accepted fact that the Defendant's anticipated divorce settlement
      was the only source of funds with which the Defendant could have likely paid the
      Plaintiff's accrued and anticipated fee amounts, applicable law gave the Plaintiff
      two viable options in August 2016 by which to address the growing fee problem in
      light of its existing fiduciary duty:  (1) cut its losses by seeking leave to withdraw
      from the representation; or (2) proceed with a comprehensive disclosure to the
      Defendant, as an existing client, regarding the scope of all of her rights that would
      be impacted under the terms of the proposed Supplemental Fee Agreement.

104.    The circumstances surrounding the proposal of the Supplemental Fee Agreement, including the fear of the Defendant about proceeding in the Divorce Case without representation and the economic stress of the Defendant, including lingering doubts regarding her ability to obtain replacement counsel or to finance a contentious divorce proceeding, were prevalent considerations at the time when the Plaintiff consulted with its existing client about the compromise of her rights as proposed in the Supplemental Fee Agreement.

105.    The conveyance of unattributable statements from unidentified tax professionals at random times during the representation regarding the impact of any proposed invasion of any retirement funds did not constitute a proper disclosure to the Defendant prior to the execution of the Supplemental Fee Agreement regarding the impact which the proposed terms of that agreement would have upon the rights of the Defendant.

106.    The tendering of sporadic suggestions by Barbknecht at random times during the representation that the Defendant should consult a tax professional did not constitute a proper disclosure to the Defendant prior to the time of the execution of the Supplemental Fee Agreement regarding the impact which the proposed terms of that agreement would have upon the rights of the Defendant.

107.    The failure of the Plaintiff to make any effort to advise the Defendant of the nature and scope of her exemption rights under state law precluded the presentation of a proper disclosure by the Plaintiff to the Defendant prior to the time of the execution of the Supplemental Fee Agreement regarding the impact which the proposed terms of that agreement would have upon her rights.

108.    The Plaintiff's contention that Barbknecht did not prevent the Defendant from seeking independent counsel to advise her regarding the impact of the proposed Supplemental Fee Agreement is wholly insufficient to rebut the presumption of unfairness or invalidity arising under Texas law.

109.    The bare, oral assertion by Barbknecht in his August 2016 meetings with its existing client that it might be advisable for the Defendant to seek independent legal advice regarding the terms of the proposed Supplemental Fee Agreement is wholly insufficient to rebut the presumption of unfairness or invalidity arising under Texas law.[76]

---

[76] *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 20 S.W.3d 692, 699 (Tex. 2000).

110.   Despite the Defendant's willingness at the time to provide any type of assurance to the Plaintiff in order to ensure Barbknecht's continued participation on her behalf in the Divorce Case, the encumbrances and other rights inuring to the Plaintiff's benefit arising from the Supplemental Fee Agreement with its existing client are invalid under Texas law.

111.   The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht adequately informed the Defendant, as an existing client, about the circumstances surrounding, and the implications arising from the Supplemental Fee Agreement.

112.   The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht adequately informed the Defendant, as an existing client, of all of the material facts regarding the impact of the Supplemental Fee Agreement.

113.   The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht ensured that the Defendant, as an existing client, was fully informed about the impact of the Supplemental Fee Agreement by procuring independent counsel to advise the Defendant regarding the legal soundness or advisability of the proposals contained in the Supplemental Fee Agreement.

114.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the Defendant, as an existing client, was adequately aware of the effects and any material disadvantages arising from the encumbrances arising under the proposed Supplemental Fee Agreement.

115.   The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht adequately informed the Defendant, as an existing client, that the funds to be received by the Defendant from her husband's retirement account constituted exempt property and that such property would retain that exempt status under Texas law once conveyed to the Defendant.

116.   The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht adequately informed the Defendant, as an existing client, that in granting the encumbrances under the terms of the Supplemental Fee Agreement, she was forfeiting valuable exemption rights that would have otherwise protected those retirement funds from any seizure by the Plaintiff in the event of any future

-20-

judgment in favor of the Plaintiff for its unpaid attorney's fee claim.[77]

117. The Plaintiff failed to demonstrate by a preponderance of the evidence that Barbknecht adequately informed the Defendant, as an existing client, that the Supplemental Fee Agreement would convey to the Plaintiff a right to pursue the Defendant's retirement funds that the Plaintiff would not have otherwise possessed.

118. The Plaintiff failed to demonstrate by a preponderance of the evidence that the rights and encumbrances granted to it under the Supplemental Fee Agreement were fair to its existing client.

119. The Plaintiff failed to demonstrate by a preponderance of the evidence that the concessions made by the Defendant, as its existing client, in the form of the rights and encumbrances conveyed to the Plaintiff under the Supplemental Fee Agreement were reasonable under the circumstances.

120. In light of its failure to overcome the presumption of unfairness and invalidity, thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff unenforceable under Texas law, the Plaintiff failed to establish by a preponderance of the evidence that the transfer of her exempt property by the Defendant from the QDRO Retirement Account into a new IRA within the prescribed rollover period was improper.

121. In light of its failure to overcome the presumption of unfairness and invalidity, thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff unenforceable under Texas law, the Plaintiff failed to establish by a preponderance of the evidence that the Defendant engaged in a transfer or concealment of property prior to the filing of the bankruptcy case with an intent to hinder, delay, or defraud the Plaintiff.

122. In light of its failure to overcome the presumption of unfairness and invalidity, thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff unenforceable under Texas law, the Plaintiff failed to establish by a preponderance of the evidence that the Defendant made false representations in the execution of the Supplemental Fee Agreement upon which the Plaintiff could justifiably rely.

---

[77] In Texas, a court may not generally order the turnover of exempt property or the proceeds of exempt property for the benefit of a judgment creditor. *See, e.g., Stanley v. Reef Sec., Inc.*, 314 S.W.3d 659, 665 (Tex. App.—Dallas 2010, no pet.); *Fitzgerald v. Cadle Co.*, 2017 WL 4675513, at *1-2 (Tex. App.—Tyler Oct. 18, 2017, no pet.); 2A TEX. CIV. PRAC. & REM. CODE ANN. § 31.002(f) (West 2020).

123.   In light of its failure to overcome the presumption of unfairness and invalidity,
       thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff
       unenforceable under Texas law, the Plaintiff is legally precluded from establishing
       that the execution of the unenforceable Supplemental Fee Agreement was the
       product of actual fraud committed by the Defendant.[78]

124.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant intended to avoid payment for services to be rendered by the Plaintiff
       upon the execution of the Original Fee Agreement.

125.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant secured the services of the Plaintiff through the execution of the
       Original Fee Agreement with the intention of deliberately failing or refusing to
       make full payment under that agreement once the services had been rendered.

126.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant intentionally and knowingly secured the Plaintiff's performance under
       the Original Fee Agreement by deception.

127.   In light of its failure to overcome the presumption of unfairness and invalidity,
       thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff
       unenforceable under Texas law, the Plaintiff failed to establish by a preponderance
       of the evidence that it had a possessory right to property arising from the
       provisions of the unenforceable Supplemental Fee Agreement.

128.   In light of its failure to overcome the presumption of unfairness and invalidity,
       thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff
       unenforceable under Texas law, the Plaintiff failed to establish by a preponderance
       of the evidence that it possessed property rights arising from the provisions of the
       unenforceable Supplemental Fee Agreement over which the Defendant exercised
       control or that the Defendant unlawfully appropriated.

129.   In light of its failure to overcome the presumption of unfairness and invalidity,
       thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff
       unenforceable under Texas law, the Plaintiff failed to establish by a preponderance
       of the evidence that it sustained damages arising from the Defendant's unlawful
       appropriation of its property rights arising from the provisions of the
       unenforceable Supplemental Fee Agreement.

---

[78] *See infra* conclusions of law ¶¶ 102-108; 179-181.

130.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant committed an unlawful appropriation of funds or services for a personal
       use with a fraudulent intent.

131.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant committed a theft of property under § 31.03 of the Texas Penal Code
       with regard to the Original Fee Agreement.

132.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant committed a theft of service under § 31.04 of the Texas Penal Code
       with regard to the Original Fee Agreement.

133.   The Plaintiff failed to demonstrate by a preponderance of the evidence that the
       Defendant committed a civil theft for the purposes of the Texas Theft Liability
       Act.

134.   The Plaintiff suffered damages, not as a result of a civil theft, but solely by the
       Defendant's breach of the Original Fee Agreement.

*2018 Income Tax Refund*

135.   As of the date of the filing of her bankruptcy petition, April 29, 2018, only one-
       third of the 2018 tax year had passed.

136.   Given the Defendant's timely rollover of the $100,000 which she received from
       her QDRO Retirement Account, that sum was not required to be included as gross
       income on her 2018 tax return, and thus the significant tax withholding which had
       occurred when the Defendant procured a distribution from the QDRO Retirement
       Account in 2018 was not needed to meet the Defendant's 2018 federal tax liability.

137.   As a result, the Defendant's 2018 employment income of $52,804 derived from
       her career as a public school educator was supplemented by the $47,059 that the
       Ingersoll-Rand Company Employee Savings Plan had tendered to the IRS and
       treated was a taxable distribution to her.[79]

138.   Thus, the Defendant's adjusted gross income for 2018 was $99,840,  in

---

[79] Ex. 33 at 9.

comparison to her 2017 adjusted gross income of $53,656.[80]

139.    The Defendant's income tax withholding amount for 2018 was $51,693, in comparison to her 2017 income tax withholding amount of $5,458.[81]

140.    The Defendant was entitled to, and received in early 2019, a tax refund of $37,048 upon the filing of her 2018 federal income tax return because of the significantly higher withholding amount arising from her withdrawal of funds from the QDRO Retirement Account in early 2018.[82]

141.    Her 2017 federal income tax refund was $2,292.[83]

142.    An overwhelming portion of that 2018 tax refund, arising from the actions surrounding the Defendant's QDRO Retirement Account distribution in early 2018, constituted property of her Chapter 7 bankruptcy estate.

143.    The Defendant did not personally notify the Chapter 7 Trustee in the spring of 2019 that she was the recipient of such a significant tax refund based primarily upon her withdrawal of funds from the QDRO Retirement Account in the pre-petition period.

144.    She testified at trial that she believed that her attorneys communicated the existence of the 2018 tax refund to the Trustee, but she acknowledged that she had no actual, personal knowledge of such a communication.

145.    There is no evidence of a direct communication to the Trustee regarding the tax refund occurring contemporaneously with the filing of the tax return or the receipt of the tax refund.

146.    The entire 2018 tax refund of $37,048 was spent by the Defendant in 2019 on personal expenses.[84]

---

[80]  *Id.* at 3.

[81]  *Id.*

[82]  *Id.* at 9.  MSJ Established Fact #45.

[83]  *Id.* at 3.

[84]  MSJ Established Fact #46.

147.    The Defendant-Debtor never amended her bankruptcy schedules to reflect the existence of the sizable tax refund derived from her pre-petition activities nor of her unauthorized disposition of that estate property.

148.    The docket of this adversary proceeding documents that the Chapter 7 Trustee eventually learned of the $37,000 tax refund—but not at a time prior to the acquisition and appropriation of the tax refund by the Defendant.

149.    There is no evidence in the record that the Chapter 7 Trustee subsequently made a written or oral demand upon the Defendant for return of the relevant portions of the 2018 tax refund.[85]

150.    The Defendant claims that, because the tax refund materialized about a year after she filed for bankruptcy relief, she was unaware that:

    (a)  a substantial portion of that refund might be property of her bankruptcy estate;
    (b)  she needed to disclose her receipt of that refund; and that,

    (c)  upon demand, she was required to turnover that refund to the Chapter 7 Trustee to the degree it derived from pre-petition activity.

151.    However, there are several things that the Defendant clearly knew in early 2019.

152.    The Defendant knew that she had appropriated the approximate sum of $147,000 from the QDRO Retirement Account in late January-early February 2018.

153.    The Defendant knew that, per her express directive, $100,000 had come directly to her and that the substantial remainder of $47,059 had been tendered to the IRS as a tax withholding pending the ultimate determination of her 2018 federal tax liability.

154.    Upon the filing of her 2018 tax return in early 2019, the Defendant knew about the unusual size of her anticipated refund in comparison to prior tax years—a refund

---

[85]  In all candor, the inaction of the Trustee with regard to the unauthorized disposition of estate property by the Debtor and his literal concurrence with the legal position of the Defendant with regard to the disposition of that significant estate asset as reflected in the pre-trial order (executed prior to his abandonment of litigation claims on the eve of trial) leaves the Court quite mystified.

that was over sixteen (16) times greater than her 2017 refund.

155.   The Defendant knew that this was a highly unusual financial event occurring in her life —after months of financial deprivation, creditor lawsuits, and general economic stress arising from the divorce.  From her perspective, a significant ray of financial sunshine was appearing after months of dark economic clouds.

156.   The Defendant knew at the time she filed the tax return, and later when she received the substantial refund, that her bankruptcy case was still open and that the complaint filed in this adversary proceeding was challenging her entitlement to the entry of a discharge order in her favor in her Chapter 7 bankruptcy case.

157.   From the filing date of her bankruptcy case in April 2018 to the date of her receipt of that unusual tax refund, there was never a time in which she was not represented by an experienced bankruptcy attorney.

158.   The Defendant knew that, in addition to representing her in the initial stages of her Chapter 7 case, Mr. Leinart had assisted her in filing amended schedules in August 2018—months after the initiation of the case—in order to make a more comprehensive disclosure to the Trustee, her creditors, and to the Court regarding the scope of her property and debts.

159.   On the date that she received the unusually large tax refund, the Defendant knew that additional information at times needed to be tendered to the trustee and her creditors in order to fulfill her disclosure obligations as a Chapter 7 debtor.

160.   The Defendant knew that she had not disclosed the existence of the tax refund to the Trustee or to her creditors in any manner.

161.   The Defendant's undisclosed and intentional acquisition and appropriation of the tax refund constituted a transfer, removal and concealment of property.

162.   The Defendant's undisclosed and intentional acquisition and appropriation of the tax refund constituted a transfer, removal and concealment of property of the bankruptcy estate.[86]

---

[86]   The reference to the tax refund in this context refers solely to the portion of the refund derived from the pre-petition activities.  The portion of the tax refund attributable to the Defendant's earnings arising after the commencement of her bankruptcy case does not constitute property of the Chapter 7 bankruptcy estate.

163. The Defendant's undisclosed and intentional acquisition and appropriation of the tax refund constituting property of the bankruptcy estate occurred after the filing of her Chapter 7 bankruptcy case.

164. The Defendant gratuitously appropriated and consumed the entire $37,048 tax refund without notice to the Trustee or any creditor, thereby depriving the bankruptcy estate of significant property without consideration.

165. The Defendant gratuitously appropriated and consumed the entire $37,048 tax refund without notice to the Trustee or any creditor, thereby retaining possession and use of the money and enjoying all of the benefits therefrom.

166. The Defendant gratuitously appropriated and consumed the entire $37,048 tax refund without notice to the Trustee or any creditor, thereby acting at her discretion to improve her financial condition through that appropriation to the detriment of her creditors.

167. Such unilateral actions, together with consideration of the circumstances surrounding the Defendant's undisclosed and intentional acquisition and appropriation of the tax refund, gives rise to a presumption that the Defendant's actions were performed with an intent to hinder, delay or defraud a creditor, including the Plaintiff.

168. The Defendant contends that, despite the undisclosed and intentional appropriation of the tax refund, she cannot be determined to have spent the tax refund constituting estate property with an intent to hinder, delay, or defraud creditors when the sole evidence regarding her intent in that regard is that she was advised by her lawyer that she could engage in that conduct.

169. The Defendant testified at trial that she contacted her dischargeability litigation counsel, Mr. Lewis ("Lewis"), and he informed her that she was free to spend the tax refund without disclosure.

170. Specifically during the adverse direct examination of the Defendant by Plaintiff's counsel, Mr. Urteago, the following was elicited:

Q: (by Mr. Urteago):      Okay.  Did anyone ever advise you "hey, it's okay for you to pay that $37,000, or excuse me, "it is okay for you to spend that $37,000 tax refund?"

A: (by Ms. Keese):        Yes.

| | |
|---|---|
| Q: (by Mr. Urteago): | Who specifically told you that was okay? |
| A: (by Ms. Keese): | Mr. Lewis.  My attorney. |
| Q: (by Mr. Urteago): | Well . . . were you advised prior to spending the money that it was okay for you to spend the money? |
| A: (by Ms. Keese): | Yes. |
| Q: (by Mr. Urteago): | Okay.  So, before you ever spent a cent of that $37,000 tax refund, you were specifically advised that it was okay? |
| A: (by Ms. Keese): | I asked, yes.[87] |

171.    No evidence was tendered by Lewis whatsoever with regard to his participation in this conversation nor any factual preludes to it.

172.    There is no clear indication of the precise time at which this purported conversation took place nor of the scenario in which it occurred.

173.    Lewis proffered a rationale in his closing argument to the Court[88] but, as he well knows, the [a]rgument of counsel is not evidence," *Smiley v. Gary Crossley Ford, Inc*., 859 F.3d 545, 557 (8th Cir. 2017); *Morrissey v. William Morrow & Co., Inc*., 739 F.2d 962, 967 (4th Cir. 1984), and "representations by counsel cannot override

---

[87]    This is an informal transcription of portions of the trial record prepared by the Court.  Though it has diligently sought to ensure the accuracy of its transcription, the digital recording stands as the official record of the testimony solicited.

[88]    Lewis's proffered rationale for the "permission" that he purportedly gave to the Defendant to engage in this undisclosed acquisition and theft of estate property was based on asserted practicality— that, since the Defendant's receipt of the refund was occurring a year after the bankruptcy had been initiated, this was not the typical tax refund scenario normally presented to a trustee and, because a year had passed and it was a 2018 tax return arising in a case filed in 2017, "you're not thinking, 'oh, this is property of the estate' and you're not thinking, 'well, this really belongs to the trustee." He also referenced the Trustee's lack of interest upon his involvement in this adversary, but that is based upon the convenient omission that there was no Trustee involvement at the time of the Defendant's receipt and dissipation of the asset.   Interestingly, the closing by Lewis closing was cloaked in crafted, murky language did not actually contain an acknowledgment that he, in fact, had given the precise permission to which the Defendant testified.

the sworn, clear testimony of the [witness.]" *PremierTox 2.0, Inc. v. Coventry Health & Life Ins. Co.*, 2019 WL 2192128, at *3 (W.D. Ky. May 21, 2019).

174.   The Defendant has failed to present sufficient evidence that rebuts the presumption established by the evidence that her action in acquiring and appropriating bankruptcy estate property was performed with an intent to hinder, delay or defraud a creditor, including the Plaintiff.

175.   The Defendant has failed to present sufficient evidence that establishes that her reliance upon the advice of counsel was reasonable.

176.   The Defendant has failed to present sufficient evidence that establishes that her reliance upon the advice of counsel was in good faith.

177.   The Defendant has failed to present sufficient evidence that establishes that the advice of counsel which she received was legally viable advice upon which she could realistically and reasonably rely.

178.   Even if Lewis's statement could be considered evidentiary in nature, the "practical" advice which was allegedly rendered was not merely mistaken advice. It was an absurd aberration from one of the most fundamental precepts of the Bankruptcy Code.

179.   To proceed with an intentional acquisition and appropriation of the bankruptcy estate property without any disclosure was incompatible with the statutory duties of the Defendant as a debtor under the Bankruptcy Code.

180.   It was also inconsistent with the Defendant's limited knowledge and experience gained over the preceding year about what was required of her as a bankruptcy debtor since she had amended her schedules months after her bankruptcy filing in order to provide a greater disclosure and, assuming the conversation with Counsel actually occurred, it reveals that the Defendant knew enough that she did not immediately and unilaterally treat the refunds as her own property.

181.   Finally, it was irreconcilable with the clear, ongoing duty of a bankruptcy debtor to disclose all of her property interests as the *quid pro quo* for entitlement to a discharge to advise a client to proceed with an intentional acquisition and appropriation of the bankruptcy estate property without any disclosure to creditors.

182.   The Defendant's unsupported statement that she received and relied upon legal advice from Lewis that it was permissible for her to appropriate a $37,000 tax

refund without even disclosing its existence to creditors does not furnish a legitimate excuse under the presented circumstances to justify her actions nor does it preclude a finding that she acted intentionally and fraudulently in converting the property of her bankruptcy estate to her own use.

183.   The Defendant's undisclosed and intentional acquisition and appropriation of the tax refund constituting property of the bankruptcy estate was performed by the Defendant after the filing of her Chapter 7 bankruptcy case with an intent to hinder, delay or defraud a creditor, including the Plaintiff.

*Counterclaim:  Breach of Fiduciary Duty*

184.   In her capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff failed to adequately, fully, and completely disclose to Defendant the amount of legal fees that she might incur in such proceeding if she retained Plaintiff as her attorney.

185.   There was no attorney-client relationship nor any fiduciary relationship between the Plaintiff and the Defendant at the time that the parties were exploring the possibility that the Plaintiff could serve as Defendant's attorney in the Divorce Case.

186.   The execution of the Original Fee Agreement by the parties created an attorney-client relationship between the Plaintiff and the Defendant.

187.   In her capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff committed a wrongful or disloyal act, attempted to collect an unconscionable fee, or otherwise breached his fiduciary duty to the Defendant by seeking to obtain an encumbrance upon the Defendant's exempt property in order to secure the fulfillment of the Defendant's obligations under the Original Fee Agreement.

188.   In her capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff sought the benefits of the Supplemental Fee Agreement for an improper purpose.

189.   In her capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the prospective provisions of the Supplemental Fee Agreement were *per se* illegal or against the public policy of the State of

Texas.[89]

190.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that all of the relevant circumstances surrounding the execution of the Supplemental Fee Agreement to secure the obligations of the Defendant under the Original Fee Agreement were shocking.

191.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff subordinated any interest of the Defendant to its own interest through the execution of the Supplement Fee Agreement.

192.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff took improper advantage of the Defendant's trust through the execution of the Supplemental Fee Agreement.

193.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement proximately caused any injury to the Defendant.

194.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement provided any improper benefit to the Plaintiff.

195.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the

---

[89] Contrary to the Defendant's attempt to broaden its scope, the principle derived from *In re Marriage of Banks*, 887 S.W.2d 160 (Tex. App.–Texarkana 1994, no writ) is that a court is precluded from ordering that attorney's fees be paid from the sale proceeds of homestead property. It does not prohibit nor even address a person's right to encumber one's own exempt property voluntarily.

Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement provided any benefit to the Plaintiff.

196.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement provided any benefit to the Plaintiff at the expense or to the detriment of the Defendant.

197.    In fact, though it arises through the Plaintiff's own devices, the evidence demonstrates that the invalidated Supplemental Fee Agreement actually caused significant injury to the Plaintiff because the Plaintiff erroneously relied upon it and continued its representation of the Defendant in the Divorce Case to its significant financial detriment.

198.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement established an unconscionable fee.

199.    In her capacity as the counter-plaintiff, and as the beneficiary of the presumption of unfairness and invalidity under Texas law to negate the effectiveness of the Supplemental Fee Agreement, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement negated the effectiveness of the Original Fee Agreement.

200.    Had the Plaintiff successfully completed the due diligence required to rebut the presumption of unfairness and invalidity, the voluntary granting of encumbrances upon the Defendant's exempt property by the Defendant in order to secure the fulfillment of her obligations under the Original Fee Agreement would not have been wrongful nor unconscionable.

201.    Subject to the successful completion of the due diligence required to rebut the presumption of unfairness and invalidity under Texas law, Barbknecht could have formed a reasonable belief that the voluntary granting of encumbrances upon the Defendant's exempt property by the Defendant in order to secure the fulfillment of her obligations under the Original Fee Agreement was a reasonable course of action.

202.    In her capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the execution of the Supplemental Fee Agreement constituted a breach of fiduciary duty by the Plaintiff.

203.    In light of the Defendant's failure to establish a breach of fiduciary duty by the Plaintiff, there is no misconduct upon which the Defendant can base an *in pari delicto* defense to her breach of the Original Fee Agreement.

204.    Notwithstanding her status as the beneficiary of the presumption of unfairness and invalidity under Texas law to deny the effectiveness of the Supplemental Fee Agreement and the encumbrances provided to the Plaintiff thereunder, such benefit does not release the Defendant from the financial obligations arising under the Original Fee Agreement.

205.    In its capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that the Plaintiff breached its fiduciary duty to her.

206.    In its capacity as the counter-plaintiff, the Defendant failed to demonstrate by a preponderance of the evidence that she sustained an injury as a result of any proven breach or that the Plaintiff, as counter-defendant, gained a benefit from a breach of a fiduciary duty.

207.    To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

*Jurisdiction and Allocation of Judicial Power*

1.      The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.      Setting aside momentarily the issue of this Court's power to adjudicate the Defendant's counterclaim to final judgment which is addressed separately,[90] this Court has authority to enter a final judgment on all other issues raised in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I), and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

---

[90]  *See infra* conclusions of law ¶¶ 12-30.

3.     The Bankruptcy Code requires that a debtor be granted a discharge unless one of the statutory grounds for denial of that discharge is proven.  11 U.S.C. § 727(a).

4.     The denial of a debtor's discharge is considered an extreme remedy.  *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (citing *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).

5.     "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Matl's Southwest, Inc. v. Lee* (*In re Lee*), 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004) (citing *Ichinose v. Homer Nat'l Bank* (*In re Ichinose*), 946 F.2d 1169, 1172 (5th Cir. 1991)).

6.     A denial of discharge is to be imposed only upon those debtors who have not been honest and forthcoming about their affairs and therefore have not fulfilled the duties of full disclosure required of a bankruptcy debtor.  *Buckeye Retirement Properties v. Tauber* (*In re Tauber*), 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."].

7.     Thus, speculation and surmise about the existence of such misconduct are insufficient.  Probative evidence must be presented.

8.     To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of § 727(a) are construed strictly against parties seeking to deny the granting of a debtor's discharge and liberally in favor of a debtor.  *Laughlin v. Nouveau Body & Tan, L.L.C.* (*In re Laughlin*), 602 F.3d 417, 421 (5th Cir. 2010); *Benchmark Bank v. Crumley* (*In re Crumley*), 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010).

9.     The same construction principles favoring a debtor are imposed in an action to determine the dischargeability of a particular debt.  *FNFS, Ltd. v. Harwood (In re Harwood*), 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997)).

10.    The Plaintiff bears the burden of proving that the Debtor-Defendant is not entitled to a discharge under § 727.  The standard of proof for its claim is a preponderance of the evidence.  *Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).

-34-

11.   A preponderance of the evidence standard also applies to the determination of the dischargeability of a particular debt. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

*Allocation of Judicial Power: Counterclaim*

12.   The Defendant's counterclaim seeks to recover actual damages from Plaintiff proximately caused by Plaintiff's alleged breach of fiduciary duty, including $3,000.00 derived from the amount of the attorney's fees Defendant paid to Plaintiff for its legal services to her, plus an award of exemplary damages and recovery of attorney's fees.

13.   Alternatively, even if Defendant suffered no actual damages or only minimal damages as a result of Plaintiff's alleged breach of fiduciary duty, the Defendant seeks disgorgement and forfeiture of all attorney's fees and all other compensation, if any, that Plaintiff received from Defendant.

14.   Since the relief sought by the counterclaim is composed almost exclusively of state law claims which could have arisen and been pursued in state court without the existence of a bankruptcy case,[91] the legal dispute involving the counterclaim would normally be characterized as a non-core proceeding. *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 97 (5th Cir. 1987). *See also*, *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 752 (5th Cir. 1995) [concluding that non-core proceedings are those which "encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for the bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others[.]"].

15.   If characterized as a non-core proceeding, this Court, in the absence of the consent of the parties, would only possess the power to submit proposed findings of fact and conclusions of law for review and consideration by an Article III district court for final adjudication. 28 U.S.C. § 157(c)(1).

16.   However, the Plaintiff has filed a proof of claim in the Defendant's bankruptcy case seeking allowance of all of its asserted attorney's fees.[92] That proof of claim demands payment of amounts which the Plaintiff asserts have rightfully accrued under its attorney-client fee agreement with the Defendant, as supplemented.

---

[91]  The Defendant does alternatively seek an award of attorney's fees under 11 U.S.C. § 523(d).

[92]  Ex. C.

17.   The Defendant's counterclaim directly contradicts the Plaintiff's right to recover those fees.

18.   The counterclaim seeks recovery of actual damages from the Plaintiff, "including $3,000 on account of the attorney's fees she has already paid to the Plaintiff for its legal services to her."[93]

19.   The counterclaim further seeks "a forfeiture of all attorney's fees and all other compensation, if any, that Plaintiff received from Defendant"[94] and her prayer in the counterclaim clarifies that she seeks the "forfeiting [of] all fees and compensation sought by Plaintiff in this adversary proceeding."[95]

20.   It is a direct attack on the legitimacy of the fees sought by the Plaintiff and its entitlement to a distribution from the bankruptcy estate as asserted in its proof of claim.[96]

21.   "In determining the nature of a proceeding for purposes of determining core status, the court must look to both the form and the substance of the proceeding." *Wood*, 825 F.2d at 97.

22.   Though a court must look at each claim to determine the claim's status as core or non-core, "where a party has filed a proof of claim in a debtor's case, any action asserted by that party against the debtor that raises the same issues as those encompassed by the proof of claim is a core proceeding under the authority of 28 U.S.C.A. § 157(b)(2)(B)." *Wood*, 825 F.2d at 97–98; *Beneficial Nat'l Bank v. Best Receptions Sys., Inc.* (*In re Best Reception Sys., Inc.*), 220 B.R. 932, 944–45 (Bankr. E.D. Tenn. 1998) (citing *Benedor Corp. v. Conejo Enters., Inc.* (*In re Conejo Enters., Inc.*), 96 F.3d 346, 353 (9th Cir.1996); *S.G. Phillips Constructors, Inc. v. Burlington* (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 704–06 (2d Cir.1995); *Southeastern Sprinkler Co., Inc. v. Meyertech Corp.* (*In re Meyertech*

---

[93] *Answer and Counterclaim of Hope Renee Keese* [dkt #29] at 17, ¶ 28, filed in adversary proceeding 18-4057, as such is incorporated by reference into the *Defendant's Answer to the Plaintiff's Third Amended Complaint* [dkt #53] at 10.

[94] *Id*. at ¶ 29.

[95] *Id*. at 18.

[96] Thus, adjudication of the counterclaim is at least "related to" the bankruptcy case because its outcome "could conceivably have an[] effect on the estate being administered in bankruptcy." *Wood*, 825 F.2d at 93.

*Corp.*), 831 F.2d 410, 415–18 (3d Cir.1987).

23.     As the Fifth Circuit observed in *Wood*:

> A claim against the estate is instituted by filing a proof of
> claim as provided by the bankruptcy rules. The filing of the
> proof invokes the special rules of bankruptcy concerning
> objections to the claim, estimation of the claim for allowance
> purposes, and the rights of the claimant to vote on the
> proposed distribution.  Understood in this sense, a claim filed
> against the estate is a core proceeding because it could arise
> only in the context of bankruptcy.  Of course, the state-law
> right underlying the claim could be enforced in a state court
> proceeding absent the bankruptcy, but the nature of the state
> proceeding would be different from the nature of the
> proceeding following the filing of a proof of claim.

*Wood*, 825 F.2d at 97.

24.     "Whether a pre-petition state law claim constitutes either a core or non-core
        proceeding depends upon (1) whether the creditor filed a proof of claim with the
        bankruptcy court and (2) the relationship between the state action and proof of
        claim." *Ramco, Inc. v. Charles Guy Evans & Sons, Inc.* (*In re Charles Evans
        Trucking Inc.*), 595 B.R. 715, 722–23 (Bankr. S.D. Miss. 2018) (citing *Kurz v.
        EMAK Worldwide, Inc.*, 464 B.R. 635, 642 (D. Del. 2011).

25.     We know that "[b]ankruptcy judges may exercise full judicial power over only
        those controversies that implicate the peculiar rights and powers of bankruptcy or,
        in Justice Brennan's words, controversies "at the core of the federal bankruptcy
        power." *Wood*, 825 F.2d at 96.

26.     However, full power to adjudicate the counterclaim rests in this Court because it
        goes to the heart of the restructuring of the debtor-creditor relationship.

27.     Indeed there is a substantial probability that principles of collateral estoppel will
        affect any future contested matter regarding that proof of claim, as well as any
        hypothetical adjudication of the counterclaim in the district court, and that
        probability further binds the consideration of the counterclaim to the claim
        allowance process.

28.     As one court recently observed,

> Principles of collateral estoppel and res judicata dictate
> whether a proceeding affects the claims allowance process or
> the restructuring of the debtor-creditor relationship. If the
> bankruptcy court must determine the same issues or claims in
> connection with the adversary proceeding and the allowance
> of the proof of claim, a determination of the issue or claim in
> one proceeding will preclude the relitigation of the same issue
> or claim in the other proceeding.

*Sec. Investor Prot. Corp. v. Bernard L. Madiff Inv. Sec. LLC*, 597 B.R. 466, 476
(Bankr. S.D.N.Y. 2019).

29.    Because the affirmative claims for damages and for forfeiture presented by the
       Defendant in her counterclaim are so factually and legally interconnected with the
       substance of the proof of claim for attorney's fees asserted against the bankruptcy
       estate by the Plaintiff, the resolution of the counterclaim necessarily affects the
       allowance or disallowance of that proof of claim and is thereby integral to the
       restructuring and the adjudication of the debtor-creditor relationship by and among
       the Plaintiff, the Defendant, and the Defendant's bankruptcy estate.

30.    Accordingly, this Court has authority to enter a final judgment on the counterclaim
       raised in this adversary proceeding since it statutorily constitutes a core proceeding
       as contemplated by 28 U.S.C. § 157(b)(2)(B) and meets all constitutional standards
       for the proper exercise of full judicial power by this Court.[97]

*Texas Law:  Attorney-Client Litigation*

31.    "An attorney may recover unpaid hourly fees for professional services rendered
       under the usual rules of contract law." *McRay v. Dow Golub Remels & Beverly,
       LLP*, 554 S.W.3d 702, 705 (Tex. App.—Houston [1st Dist.] 2018, no pet.)
       (citing *Stuart v. Bayless*, 964 S.W.2d 920, 921–22 (Tex. 1998)).

32.    "A party may recover attorney's fees in a breach of contract claim without an
       agreement providing for them if the party claiming the fees (1) prevails on its

---

[97]    In the event that it is subsequently determined that this Court did not possess constitutional
adjudicatory authority to enter a final judgment on the Defendant's counterclaim, this Court's findings
and conclusions regarding the Defendant's counterclaim are tendered to the district court as proposed
findings of fact and conclusions of law for its consideration.  *See supra* findings of fact 72-75, 184-206;
conclusions of law ¶¶ 12-30.  *See infra* conclusions of law ¶¶ 33-101 as applicable; and ¶¶ 186-193.

breach of contract claim and (2) recovers damages." *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 522 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

33.   "To prove a claim for attorney's fees, the attorney who sued must show (1) the attorney and the client had a valid agreement obligating the client to pay fees, (2) the attorney tendered performance, (3) the client breached the agreement by failing to pay a reasonable fee, and (4) damages resulted from the client's breach." *Webb v. Crawley*, 590 S.W.3d 570, 579 (Tex. App.—Beaumont 2019, no pet.).

34.   The attorney's contract remedy is "subject to the prohibition against charging or collecting an unconscionable fee." *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561.

35.   "A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.  Whether a particular fee amount charged by the attorney is unconscionable under all relevant circumstances of the representation is an issue for the fact finder." *J. Bennett White, P.C. v. Reeder*, 2018 WL 851367, at *2 (Tex. App.—Tyler Feb. 14, 2018, no pet.) (citing *Hoover*, 206 S.W.3d at 561.

36.   "A claim that a lawyer has violated a rule of professional conduct should be raised in a disciplinary proceeding. The disciplinary rules set forth the proper conduct of lawyers solely for the purpose of discipline within the profession." *McGuire, Craddock, Strother & Hale, P.C. v. Transcon. Realty Inv'rs, Inc.*, 251 S.W.3d 890, 896 (Tex. App.—Dallas 2008, pet. denied) (citations omitted).

37.   "A private cause of action does not exist for violation of the disciplinary rules". *Id.*

38.   "The preamble to the rules of professional conduct states: "Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." *Avdeef v. Powers*, 2012 WL 3115067, at *1 (Tex. App.—Dallas July 11, 2012, no pet.) (citing TEX. DISCIPLINARY R. PROF'L. CONDUCT PREAMBLE ¶ 15).

*Texas Law:  Charging Liens Acquired During Attorney-Client Relationship*

39.   A "lien" is generally defined as a "legal right or interest that a creditor has in another's property, lasting usually until a debt or duty that it secures is satisfied." BLACK'S LAW DICTIONARY at 1063 (10th ed. 2014).

40.    "An attorney's lien is defined as the right of an attorney to hold or retain a client's money or property ... or to encumber money payable to the client until the attorney's fees have been properly determined and paid." *Lemon v. Hagood*, 545 S.W.3d 105, 124–25 (Tex. App.—El Paso 2017, pet. denied).

41.    A "charging lien" is "an attorney's lien on a claim that the attorney has helped the client perfect, as through a judgment or settlement.  A lien on specified property in the debtor's possession."  BLACK'S LAW DICTIONARY at 1063 (10th ed. 2014).

42.    "Texas does not, by statute, provide for an automatic lien for attorneys on sums recovered by a client." *United States v. Betancourt* (*Betancourt I*), 257 F. App'x. 785, 788 (5th Cir. 2007) (citing *Johnson v. Stephens Dev. Corp.*, 538 F.2d 664, 665 (5th Cir.1976)).

43.    Instead, Texas law recognizes two types of liens for attorney's fees.  *United States v. Betancourt* (*Betancourt II*), 2005 WL 3348908, at *2 (S.D. Tex. Dec. 8, 2005), *aff'd*, 257 F. App'x. 785 (5th Cir. 2007); *United States v. Grubert*, 191 F. Supp. 326, 327 (S.D. Tex. 1961).

44.    The first is a possessory lien sometimes referenced as a "retaining lien."  This is a common law lien which an attorney can assert over a client's property in the attorney's possession.  *Betancourt I*, 257 F. App'x. at 788; *Betancourt II*, 2005 WL 3348908, at *3.

45.    The creation of a retaining lien requires both actual possession by the attorney and that such property comes into the attorney's possession "in his character as an attorney at law." *Thomson v. Findlater Hardware Co.*, 109 Tex. 235, 237, 205 S.W. 831, 832 (Tex.1918).

46.    "A Texas attorney only has a lien over money collected for his client and in his possession." *Betancourt II*, 2005 WL 3348908, at *3.

47.    Since no client funds actually came into the Plaintiff's possession in this case, no possessory lien could have arisen for the benefit of the Plaintiff.

48.    The second type of attorney's lien recognized by Texas law is one created pursuant to a contractual agreement.

49.    "Under Texas law, a contract may establish an attorney's lien for money received in judgment or settlement of a matter." *Norem v. Norem*, 2008 WL 2245821, at *5–6 (N.D. Tex. June 2, 2008) (citing *Betancourt II*, 2005 WL 3348908, at *3 and

*Thomson*, 205 S.W. at 832).

50. An attorney's acquisition of a charging lien through an express contract is not forbidden by the Texas Disciplinary Rules of Professional Conduct.  Indeed, it is expressly authorized.

51. Rule 1.08(h) provides that: "A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, ***except*** that the lawyer may:

> (1) acquire a lien granted by law to secure the lawyer's fee or expenses. . . .

TEX. DISCIPLINARY R. PROF'L. CONDUCT 1.08(h), and reprinted in 3B TEX. GOV'T CODE ANN. tit. 2, subtit. G app. A, sec. 9 (West 2019) (TEX. STATE BAR R. art. X, § 9) (emphasis added).

52. "So while there is no common law charging lien granted to an attorney as a matter of right, the Texas courts have recognized with approval situations where attorneys have acquired a charging lien through an express contract, without running afoul of any ethical issue."  *Mount Spelman & Fingerman, P.C. v. GeoTag, Inc*., 70 F. Supp. 3d 782, 786 (E.D. Tex. 2014) (citing *Dow Chem. Co. v. Benton*, 163 Tex. 477, 357 S.W.2d 565, 566–67 (1962)); *Kansas City So. Rwy. Co. v. Chavez* (*In re Rosenthal & Watson, P.C.*), 612 B.R. 507, 565 (Bankr. W.D. Tex. 2020) ["Under Texas law, an attorney may establish a valid lien for attorney's fees and expenses, by contract with a client."].

53. The Defendant's contention that the execution of the Supplemental Fee Agreement was unethical and unenforceable *per se* by the Plaintiff is an incorrect statement of Texas law.

54. Furthermore, the right of an individual in Texas to grant a consensual lien upon personal property otherwise entitled to exemption protection has long been recognized.

55. As one court described it,

> It is well settled that [an individual], even if the property claimed by him was exempt by law from forced sale, had the right to mortgage it to [a company], and that such mortgage created a valid lien upon it, which [that company] had the

-41-

right to enforce.

*Rose v. Martin*, 33 S.W. 284, 284–85 (Tex. Civ. App. 1895, no writ)

56.   As recognized in an opinion adopted by the Supreme Court of Texas almost one hundred years ago:

> R.S. art. 3793 [the then-existing personal exemption statute] provides that personal property exemptions shall not apply when the debt is secured by lien on such property. There is no provision which in any way regulates the form or manner in which such liens shall be created or by means of which they shall be evidenced. In the absence of such regulation we think it only requisite that the lien be such as the law generally recognizes as valid.

*Sparkman v. First State Bank of Handley*, 112 Tex. 33, 39, 244 S.W. 127 (Comm'n App. 1922, holding approved, judgm't adopted).

57.   Indeed the Texas personal property exemption statutes still expressly provide that any right of an individual or a family to exempt the personal property designated by the statute is ". . . exclusive of the amount of any liens, security interests, or other charges encumbering the property." 4 TEX. PROP. CODE ANN. §  42.001(a) (1) and (2) (West Supp. 2020).

58.   While an election by an individual to grant an encumbrance upon a "qualified savings plan"[98] would likely result in adverse tax consequences,[99] such a transaction is not legally precluded either by federal law or by the fact that the encumbered funds would otherwise enjoy an exempt status under the laws of the State of Texas.[100]

---

[98]   See 4 TEX. CIV. PRAC. & REM. CODE ANN. § 42.0021(a) (West Supp. 2020) for a non-exclusive listing of those types of plans or accounts that constitute a "qualified savings plan" for the purpose of the Texas personal property exemption scheme. The term "qualified savings plan" specifically includes "a retirement plan sponsored by a private employer, government, or church." 4 TEX. CIV. PRAC. & REM. CODE ANN. § 42.0021(a)(1) (West Supp. 2020).

[99]   *See, e.g.*, the interplay between 28 U.S.C. § 408(c) and 28 U.S.C.§ 408(e)(4).

[100]   Effectively, such a voluntary election would supplant the exemption protection from forced seizure by general creditors in favor of the encumbrance to the specially selected creditor.

**-42-**

59.   Thus, the fact that the Defendant could protect her interest in the Ingersoll-Rand
      Company Employee Savings Plan from seizure and forced sale by general
      creditors under the Texas personal property exemptions did not preclude her from
      voluntarily exercising her right to encumber that interest under Texas law nor,
      once encumbered, was the Plaintiff precluded from enforcing it.

60.   While recognizing the general right of parties to contract and the Defendant's
      general right to encumber exempt property with a lien in Plaintiff's favor, there are
      serious considerations which arise when those rights are attempted to be exercised
      within the context of an existing attorney-client relationship.

61.   "When interpreting and enforcing attorney-client fee agreements, it is not enough
      to simply say that a contract is a contract. There are ethical considerations
      overlaying the contractual relationship." *Hoover Slovacek LLP v. Walton*, 206
      S.W.3d 557, 560–61 (Tex. 2006) (internal quotations omitted).

62.   The Supreme Court of Texas outlined those considerations in that case:

               In Texas, we hold attorneys to the highest standards of ethical
               conduct in their dealings with their clients. The duty is
               highest when the attorney contracts with his or her client or
               otherwise takes a position adverse to his or her client's
               interests. As Justice Cardozo observed, [a fiduciary] is held to
               something stricter than the morals of the marketplace. Not
               honesty alone, but the punctilio of an honor the most
               sensitive, is then the standard of behavior. Accordingly, a
               lawyer must conduct his or her business with inveterate
               honesty and loyalty, always keeping the client's best interest
               in mind.

      *Id*. (citing *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 866-67
      (Tex. 2000) (Gonzales, J., concurring and dissenting) (alteration in original).

63.   As recently stated:

               a lawyer has a duty, at the outset of representation, to inform
               a client of . . . the contract's implications for the client.  A
               lawyer has a duty to inform the client of all material facts, and
               this duty requires that a lawyer's fee agreement be clear. The
               lawyer must conduct his business with his client with

-43-

inveterate honesty and loyalty and must always keep the client's best interest in mind. A breach of fiduciary duty occurs when an attorney *benefits* improperly from the attorney-client relationship by, inter alia, making material misrepresentations, subordinating his client's interests to his own, or taking advantage of the client's trust.

*Spradley v. Michael E. Orsak, LP*, 020 WL 7349490, at *10 (Tex. App.—Houston [1st Dist.] Dec. 15, 2020, no pet. h.) (emphasis added).

64.     Thus, "[c]ontracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized. Because the relationship is fiduciary in nature, there is a presumption of unfairness or invalidity attaching to such contracts." *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 20 S.W.3d 692, 699 (Tex. 2000).

65.     Such a presumption protects the integrity and fidelity of the attorney-client relationship and, unless the evidence demonstrates affirmative conduct by the attorney conducive to the client's interests that can survive such intense scrutiny, an agreement with an existing client will be rendered unenforceable.

66.     These concerns were highlighted in *Archer v. Griffith*, 390 S.W.2d 735 (Tex. 1964). As the Supreme Court of Texas observed in *Archer*, "[t]he relation between an attorney and his client is highly fiduciary in nature, and their dealings with each other are subject to the same scrutiny, intendments and imputations as a transaction between an ordinary trustee and his cestui que trust." *Id*. at 739.

67.     "The burden of establishing its perfect fairness, adequacy, and equity, is thrown upon the attorney, upon the general rule, that he who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. This principle has always been recognized by the Texas courts." *Id*.

68.     "The general rule mentioned above applies to a contract or other transaction relating to compensation provided the attorney-client relationship was in existence at the time." *Id*.

69.     "Although an attorney is not incapacitated from contracting with his client for compensation during the existence of the relation of attorney and client, and a fair

-44-

and reasonable settlement of the compensation to be paid is valid and enforceable, if executed freely, voluntarily, and with full understanding by the client, the courts, because of the confidential relationship, scrutinize with jealousy all contracts between them for compensation which are made while the relation exists." *Id.*

70.   "There is a *presumption of unfairness or invalidity attaching to the contract*, and the burden of showing its fairness and reasonableness is on the attorney." *Id.* (emphasis added).

71.   The scrutiny that must be applied involves an examination of the thoroughness with which the attorney fulfills the disclosure requirements arising from the existing attorney-client relationship.

72.   "The attorney's special responsibility to maintain the highest standards of conduct and fair dealing establishes a professional benchmark that informs much of our analysis in this [type of] case." *Hoover Slovacek,* 206 S.W.3d at 561.

73.   "Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized.  Part of the lawyer's duty is to inform the client of all material facts. And so that this responsibility is not a mere and meaningless formality, the lawyer must be clear." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011).

74.   Such scrutiny is to determine whether the client was adequately informed and "whether the lawyer has been reasonably clear must be determined from the client's perspective." *Id.* at 451.

75.   "Construing client-lawyer agreements from the perspective of a reasonable client in the circumstances imposes a responsibility of clarity on the lawyer . . . ." *Id.* at 453.

76.   "[T]he lawyer must show that the client was adequately aware of the effects and any material disadvantages of the proposed contract." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. (h) (2000).

77.   Building on the *Anglo-Dutch Petroleum* foundation more recently, the Supreme Court of Texas observed that:

A lawyer has a duty to appreciate the importance of words

and detect and repair omissions in client-lawyer contracts.
The goal of an attorney-client fee agreement is to ensure that
the client is informed of the terms.  This does not mean every
dispute over the contract's meaning must be resolved against
the lawyer, but whether the lawyer was reasonably clear is
determined from the client's perspective.  Placing the burden
on the lawyers to be "clear" in fee agreements is warranted,
given a lawyer's sophistication, the trusting relationship
between a lawyer and his client, and a lawyer's responsibility
to notify the client of the fee's basis or rate at the outset.

*In re Davenport*, 522 S.W.3d 452, 458 (Tex. 2017).

78.    Under the prescribed standards, the Supplemental Fee Agreement executed by the
       Plaintiff and the Defendant on August 18, 2016 is unenforceable and all
       encumbrances or other legal benefits otherwise granted to the Plaintiff thereunder
       are rendered null and void.

79.    As merely a contractual supplement which unsuccessfully specified a means by
       which the Defendant's financial obligations under the Original Fee Agreement
       would be addressed, the nullification of the Supplemental Fee Agreement caused
       by the Plaintiff's failure to overcome the presumption of unfairness and invalidity
       did not affect the validity nor the enforceability of the obligations owed by the
       Defendant to the Plaintiff under the Original Fee Agreement.

80.    Indeed, in law and in fact, the application of the presumption of unfairness and
       invalidity which nullifies the enforceability of the Supplemental Fee Agreement
       worked exactly as designed.

81.    It preserved the integrity of the attorney-client relationship.

82.    In a scenario in which the existing client was desperate to maintain the services of
       her attorney in the existing divorce litigation, the application of the presumption
       preserved the honesty and loyalty required in the fiduciary relationship by
       precluding the parties from effectuating any agreement which was engendered
       without full faith and allegiance to the existing attorney-client relationship.

83.    As merely a contractual supplement which unsuccessfully specified a means by
       which the Defendant's performance of her financial obligations under the Original
       Fee Agreement would be secured, the nullification of the Supplemental Fee
       Agreement caused by the Plaintiff's failure to overcome the presumption of

**-46-**

unfairness and invalidity did not constitute a breach of his fiduciary duty to the Defendant.

84.     It was not improper *per se* for the Plaintiff to seek, nor improper for the Defendant to grant, an encumbrance upon the Defendant's property which otherwise would have been exempt from seizure or forced sale in an attempt to cure the Defendant's financial inability to fund the representation of her interests in the Divorce Case.

85.     However, such a transaction had to be performed in absolute compliance with the duty of honesty and loyalty already binding upon the lawyer in that existing attorney-client relationship.

86.     The application of the presumption ensures that compliance.

87.     The presumption compels the attorney to demonstrate that the decision of the existing client to modify the compensation scheme between the parties or, in this instance, to ensure through collateralization the performance of the obligations arising under the existing compensation agreement, is an informed one and is not a product of the attorney's superior legal knowledge or the vulnerabilities of the existing client under the current circumstances.

88.     Its application precludes the attorney from committing a breach of fiduciary duty by invalidating an agreement which, with a clearer perspective away from the legal maelstrom, might be viewed as granting the attorney an improper benefit that fails to protect the client's interests or takes advantage of the client's trust.

89.     The presumption is essentially a protection against the effectiveness of what otherwise could prove to be an unconscionable provision if executed and enforced without the protections dictated by the presumption.

90.     Thus, the Plaintiff's failure to overcome the presumption of unfairness and invalidity invalidates the effectiveness of the Supplemental Fee Agreement, but its application does nothing to affect the validity or effectiveness of the ongoing attorney-client relationship or the enforceability of the Original Fee Agreement.

91.     With the Plaintiff precluded by the presumption from enjoying or enforcing any of the benefits otherwise contemplated by the Supplemental Fee Agreement, thereby effectively severing it from the remainder of the contract between the parties, the integrity of the attorney-client relationship remained intact.

92.     This is consistent with other aspects of Texas contractual law which presumes that

an illegal or unenforceable contractual provision will be severed or excised from a main agreement "so long as it does not constitute the essential purpose of the agreement." *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 230 (Tex. 2014); *In re Poly-America, L.P.*, 262 S.W.3d 337, 360 (Tex. 2008); *Hoover Slovacek*, 206 S.W.3d at 565; *Williams v. Williams*, 569 S.W.2d 867, 871 (Tex. 1978).

93.  "In determining an agreement's essential purpose, the issue is whether or not parties would have entered into the agreement absent the unenforceable provisions." *Venture Cotton*, 435 S.W.3d at 230.

94.  Since the parties in this case had already contracted for the rendition of legal services in the Original Fee Agreement, and since the enforceability of the Supplemental Fee Agreement dealt only with the limited issue of supplemental encumbrances to enforce the underlying obligations of the original agreement, the proper course of action under Texas law is to sever and deny effect to the unenforceable term. *Id.*; *In re Poly-America*, 262 S.W.3d at 360.

95.  The unenforceability of the Supplemental Fee Agreement does not defeat nor undermine the purposes of the Original Fee Agreement.

96.  "Texas law requires courts to give effect to the intent of the parties and to consider the entirety of the document[s] in question 'to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Parrott v. D.C.G., Inc.*, 2020 WL 1876096, at *4 (N.D. Tex. Apr. 14, 2020) (citing *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 698 (5th Cir. 2018) (internal quotations omitted).

97.  The Original Fee Agreement remains a binding and enforceable contract between the parties which is subject to enforcement.

98.  "In the absence of an agreement to the contrary, an attorney-client relationship generally terminates upon the completion of the purpose of the employment*.*" *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). *See also*, *Hillman Group, Inc. v. KeyMe, LLC*, 439 F. Supp. 3d 845, 855 (E.D. Tex. 2020).

99.  One recognized exception to that rule arises when the purpose of the legal employment has ended but the attorney retains possession of funds that the client is entitled to receive. *Burnett v. Sharp*, 328 S.W.3d 594, 600-01 (Tex. App.–Houston [14th Dist.] 2010, no pet.).

100.    In contemplation of actions occurring after the completion of the Divorce Case, and with no allegation or evidence that the Plaintiff was improperly withholding funds from the Defendant arising from that representation, the Defendant offers no authority for her contention that the attorney-client relationship between the Plaintiff and the Defendant continued in that period and resulted in alleged breaches of fiduciary duty by the Plaintiff arising from its efforts to collect the fees owed by the Defendant arising from the Original Fee Agreement.

101.    The Defendant has failed to establish by a preponderance of the evidence that the Plaintiff committed breaches of its fiduciary duty to the Defendant after the completion of the Divorce Case arising from its efforts to collect the unpaid fees owed by the Defendant arising from the Original Fee Agreement.

*Texas Law:  Preclusion of Fraudulent Inducement Claim*

102.    "Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)

103.    "That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties."  Id. at 798-99.

104.    "Thus, absent an enforceable contract, a fraud claimant may not recover benefit-of-the-bargain damages."  *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) [precluding a fraud claim for benefit-of-the-bargain damages "when the claim arises from a contract that has been held to be unenforceable."].

105.    To hold otherwise would allow a plaintiff to obtain the benefit of an otherwise unenforceable bargain.

106.    The presumption of unfairness and invalidity arising under Texas law protects the integrity and fidelity of the attorney-client relationship and subjects to a heightened scrutiny any agreement for compensation that arises during the existence of the attorney-client relationship.

107.    However, similar to the effect of the application of the Statute of Frauds in *Haase*, the purpose of the presumption of unfairness and invalidity is frustrated and easily circumvented if a party can claim the existence of a fraudulent inducement essentially to enforce a contract that the presumption renders unenforceable.

-49-

108.   Since the presumption of unfairness and invalidity precludes the enforcement of the Supplemental Fee Agreement in this case, the Plaintiff's claim that it was fraudulently induced by the Defendant to enter the Supplemental Fee Agreement or that the execution of the Supplemental Fee Agreement was the result of actual fraud by the Defendant is legally precluded.

*Texas Law:  Texas Theft Liability Act*

109.   Under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft."  6 TEX. PRAC. & REM. CODE ANN. § 134.003(a) (West 2019).  *See generally*, *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.– Dallas 2009, pet. denied).

110.   Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by sections 31.03–31.07, or 31.11–31.14 of the Texas Penal Code."  6 TEX. PRAC. & REM. CODE ANN. § 134.002(a) (West 2019).

111.   Section 31.03(a) of the Texas Penal Code provides that a person "commits an offense if he unlawfully appropriates[101] property with intent to deprive[102] the owner of property."  4 TEX. PENAL CODE ANN. § 31.03(a) (West 2019).

112.   Section 31.04(a) of the Texas Penal Code provides, *inter alia*, that a person "commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation:  (1) the actor intentionally or knowingly secures performance of the service by deception, threat, or false token;  . . . or (4) the actor intentionally or knowingly secures the performance of the service by agreeing to provide compensation and, after the service is rendered, fails to make full payment after receiving notice demanding payment."  5 TEX. PENAL CODE ANN. § 31.04(a) (West Supp. 2020).

---

[101]  A person "appropriates" property when he "bring[s] about a transfer or purported transfer of title or other non-possessory interest in property, whether to the actor or another, or acquire[s] or otherwise exercise control over property other than real property.  4 TEX. PENAL CODE ANN. § 31.01(4) (West 2019).

[102]  To "deprive" another of property includes any action "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; to restore property only upon payment of reward; or to dispose of property in a manner that makes recovery of the property by the owner unlikely."  4 TEX. PENAL CODE ANN. § 31.01(2) (West 2019).

113.  The element of intent for these purposes can be inferred from the surrounding circumstances. *Powers v. Caremark, Inc. (In re Powers)*, 261 F. App'x. 719, 722 (5th Cir. 2008).

114.  However, the intent to deprive must exist at the time of the taking. *Id.*; *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 492 B.R. 858, 896 (Bankr. S.D. Tex. 2013).

115.  "Appropriation of property is unlawful if it is without the owner's effective consent." 4 TEX. PENAL CODE ANN. § 31.03(b)(1) (West 2019).

116.  To recover in this context for a civil theft under the TTLA, a plaintiff must establish:  (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property or unlawfully obtained services in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. *Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3219939, at *4–5 (E.D. Tex. July 17, 2019) (citing *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011)).

117.  "To show a violation of the Texas Penal Code's theft of services provision, the plaintiff must show that the defendant: (1) intended to avoid payment for a service that the person knew was provided only for compensation; (2) acting with that intent, she intentionally and knowingly; (3) secured the other person's performance of a service; (4) by deception." *PNC Bank, N.A. v. 2013 Travis Oak Creek GP, LLC*, 2018 WL 6431005, at *14 (W.D. Tex. Sept. 28, 2018) (citing *Daugherty v. State*, 387 S.W.3d 654, 657 (Tex. Crim. App. 2013)).

118.  Notwithstanding the fact the TTLA incorporates the definition of a theft from the Texas Penal Code, a plaintiff seeking recovery under the statute must prove the elements only by a preponderance of the evidence. *NF Clean Prestacao de Servicos v. Kakal* (*In re Kakal*), 596 B.R. 335, 342 (Bankr. S.D. Tex. 2019) (citing *Powers*, 261 Fed. App'x. at 721).

119.  A person who has sustained damages resulting from theft may recover actual damages, additional statutory damages of up to $1,000, court costs and reasonable attorney's fees under this civil liability statute. 6 TEX. PRAC. & REM. CODE ANN. § 134.005 (West 2019); *Wright v. Minardi* (*In re Minardi*), 536 B.R. 171, 190 (Bankr. E.D. Tex. 2015) (citing *TXCO Resources, Inc. v. Peregrine Petroleum, LLC (In re TXCO Resources, Inc.)* 475 B.R. 781, 834 (Bankr. W.D. Tex. 2012)).

120.    The award of $1,000.00 statutory damages is contingent upon an award of actual damages. *Alcatel USA, Inc. v. Cisco Sys., Inc*., 239 F. Supp. 2d 660, 674 (E.D. Tex. 2002); *Jones v. Texas Dept. of Criminal Justice*, 2009 WL 2645028, at *2 (Tex. App.– Corpus Christi 2009, no pet.).

121.    "Actual damages," within the meaning of the Act, are those recoverable at common law. *Beaumont v. Basham,* 205 S.W.3d 608, 619 (Tex. App.– Waco 2006, pet. denied).

122.    As an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the TTLA will satisfy the requirements for larceny so as to render a debt nondischargeable under 11 U.S.C. § 523(a)(4). *S & S Food Corp. v. Sherali (In re Sherali),* 490 B.R. 104, 124 (Bankr. N.D. Tex. 2013) )

*Income Tax Refunds*

123.    "A debtor's anticipated tax refund, to the extent it is attributable to events occurring prior to the filing of the petition for bankruptcy, is part of the bankruptcy estate." *Benn v. Cole* (*In re Benn*), 491 F.3d 811, 813 (8th Cir. 2007).

124.    In deciding whether the pre-petition portion of a debtor's tax refund is property of the bankruptcy estate when the relevant tax year did not end until after the petition in bankruptcy was filed, "[e]very court that has considered this issue has held that the portion of an income tax refund that is based upon the pre-petition portion of a taxable year constitutes property of the bankruptcy estate." *Barowsky v. Serelson* (*In re Barowsky*), 946 F.2d 1516, 1518 (10th Cir. 1991).

125.    "Courts have recognized that tax refunds received after the petition may, in some cases, represent pre-petition assets and thus are part of the bankruptcy estate. The background rule under the old Bankruptcy Act, to which courts still refer in the era of the Bankruptcy Code, defines the bankruptcy estate to include property that is 'sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start.'" *In re Meyers*, 616 F.3d 626, 628 (7th Cir. 2010) (quoting *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (other internal quotations omitted).

126.    "It is well established that the pre-petition portion of a debtor's tax refund is property of the bankruptcy estate under § 541(a)(1)." *In re McInerney*, 609 B.R. 497, 503 (Bankr. N.D. Ill. 2019) (citing *Kokoszka v. Belford*, 417 U.S. 642, 647-48 (1974) and *Segal v. Rochelle*, 382 U.S. 375, 379-81 (1966)) (related citations omitted).

127.  "More precisely, a tax refund, or a portion thereof, that is received post-petition is estate property if it is attributable, in whole or in part, to a debtor's pre-petition wages and withholding payments." *Id*. (citations omitted).

128.  Thus, "[a]ll tax refunds based on a debtor's prepetition income or loss are estate property, regardless of when they are paid." *Monge v Jayme* (*In re Jayme*), 2018 WL 3218104, at *11 (Bankr. D.N.M. June 29, 2018).

129.  "Therefore, any part of [a debtor's] post-petition refunds representing interests of the debtor in property as of the commencement of the case must be turned over to the Trustee." *In re Donnell*, 357 B.R. 386, 389 (Bankr. W.D. Tex. 2006)

*Advice of Counsel*

130.  The Defendant's only defense to the § 727(a)(2)(B) claim asserted by the Plaintiff is that she was just following the advice of legal counsel, and thus she lacked any intent to hinder, delay, or defraud creditors.

131.  Under certain circumstances, reliance upon advice of counsel may show that a debtor lacked the requisite intent to defraud.  *Church Joint Venture v. Blasingame (In re Blasingame)* 2015 WL 13106325, at *20 (Bankr. W.D. Tenn. Jan. 19, 2015), *aff'd*, 559 B.R. 692 (B.A.P. 6th Cir. 2016) (citing, *inter alia*, *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

132.  As one court has summarized this defense,

> Reliance on an attorney's advice may excuse acts that otherwise bear indicia of fraud. This affirmative defense may prevent a finding of actual fraud if the advice if reasonable and the attorney was fully informed before giving. When fraudulent intent is an issue, advice of counsel is a factor to be considered unless the party should know that failure to disclose an asset is forbidden by law.

*Roberts v. Oliver* (*In re Oliver*), 414 B.R. 361, 376 (Bankr. E.D. Tenn. 2009)

133.  Although some courts view the advice of counsel defense as a formal affirmative defense, most construe it as a species of evidence that is offered to negate the required element of a fraudulent intent for liability under § 727(a), *see, e.g., Rupp v. Biorge (In re Biorge)*, 536 B.R. 24, 30 (Bankr. D. Utah 2015), particularly when

the presumption of a fraudulent intent has arisen and a debtor is required to rebut it.

134.    A debtor's reliance on advice of counsel constitutes an excuse for her transfer or concealment of property from creditors and will prevent the court from denying that debtor's discharge only where her reliance is reasonable and in good faith. *Tow v. Henley* (*In re Henley*), 480 B.R. 708, 791 (Bankr. S.D. Tex. 2012); *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005); *Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991); *Neary v. Peres* (*In re Peres*), 2007 WL 2766776, at *8 (Bankr. N.D. Tex. Sept. 18, 2007).

135.    However, a debtor's reliance on advice of counsel is not reasonable solely because of the existence of the attorney-client relationship nor a disparate exposure to legal training between the client and the attorney.

136.    Nor is the standard wholly subjective or satisfied by a debtor's blind reliance upon what she was told.

137.    It is based upon an examination of the totality of the circumstances, including an evaluation of the underlying legal viability of the advice provided.

138.    "Mistaken reliance on an attorney's advice will excuse acts of fraudulent intent if the advice was reasonable and the attorney was aware of all relevant facts." *Global Control Sys., Inc. v. Luebbert* (*In re Luebbert*), 595 B.R. 314, 333 (Bankr. W.D. Mo. 2018); *Roberts v. Oliver* (*In re Oliver*), 414 B.R. 361, 376 (Bankr. E.D. Tenn. 2009); *Dains v. Dains* (*In re Dains*), 384 B.R. 241, 253 (Bankr. W.D. Mo. 2008).

139.    "Where a debtor's actions are motivated by attorney advice, reliance on this advice may rebut a presumption of fraudulent intent if the reliance was reasonable and the attorney was fully informed before giving it."  *Doeling v. Gapp* (*In re Gapp*), 604 B.R. 371, 387 (Bankr. D.N.D. 2019) (citing, *inter alia*, *City Nat'l Bank v. Bateman* (*In re Bateman*), 646 F.2d 1220, 1224 (8th Cir. 1981); *Layng v. Rael* (*In re Rael*), 753 F. App'x. 649, 656 (10th Cir. 2018); *Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017).

140.    "[The] Debtor carries the burden of showing a full disclosure of all relevant facts to the attorney and a reasonable belief that he was receiving reliable advice."  *Id*.

141.    Courts of appeals that might otherwise accept advice of counsel as evidence

negating fraudulent intent refuse to do so when the advice was clearly wrong." *BMO Harris Bank, N.A. v. Brahos* (*In re Brahos*), 589 B.R. 381, 398 n. 22 (Bankr. N.D. Ill. 2018) (citing *Zizza v. Harrington* (*In re Zizza*), 875 F.3d 728, 732 (1st Cir. 2017) [stating that advice of counsel is not a defense "when it is transparently plain" that information omitted by the attorney should have been provided].

142.   "Likewise, the advice of counsel is no defense when it should have been obvious to the debtor that his attorney was mistaken."  *Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017).

*§ 727(a)(2)(A): Pre-Petition Transfer or Concealment of Property.*

143.   Section 727(a)(2)(A) provides:

The court shall grant the debtor a discharge unless —

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed —

property of the debtor, within one year before the date of the filing of the petition. . . .

144.   In order to establish grounds for denial of a discharge under § 727(a)(2)(A), a plaintiff must demonstrate by a preponderance of the evidence that there was:
(1) a transfer or concealment of property;
(2) belonging to the debtor;
(3) within one year of the filing of the petition; and
(4) performed with an intent to hinder, delay or defraud a creditor or an officer of the estate.

*Judgment Factors, LLC v. Packer* (*In re Packer*), 816 F.3d 87, 92–93 (5th Cir. 2016); *Pavy v. Chastant* (*In re Chastant*), 873 F.2d 89, 90 (5th Cir. 1989).

145.   In light of the Plaintiff's failure to overcome the presumption of unfairness and invalidity, thereby rendering the Supplemental Fee Agreement and its benefits to the Plaintiff unenforceable under Texas law, and thereby precluding any factual finding that the Defendant engaged in a transfer or concealment of property prior to the filing of the bankruptcy case with an intent to hinder, delay, or defraud the Plaintiff, the relief sought by the Plaintiff under § 727(a)(2)(A) must be denied.

*§ 727(a)(2)(B): Post-Petition Transfer or Concealment of Property.*

146.   11 U.S.C. § 727(a)(2)(B) provides:

The court shall grant the debtor a discharge unless —

the debtor, with intent to hinder, delay, or defraud a creditor
or an officer of the estate . . . has transferred, removed,
destroyed, mutilated, or concealed, or has permitted to be
transferred, removed, destroyed, mutilated, or concealed —

property of the estate, after the date of the filing
of the petition. . . .

147.   "The purpose of § 727(a)(2)(B) is to prevent the discharge of a debtor who
attempts to avoid payment to creditors by concealing or otherwise disposing of
assets." *Welch v. LaPace* (*In re LaPace*), 614 B.R. 911, 916 (Bankr. M.D. Fla.
2020).

148.   "Section 727(a)(2)(B) is intended to deny discharge to a debtor who fails to
disclose transactions regarding his assets subsequent to filing his petition for
bankruptcy." *Pisculli v. T.S. Haulers, Inc.* (*In re Pisculli*), 426 B.R. 52, 59
(E.D.N.Y. 2010), *aff'd*, 408 F. App'x. 477 (2d Cir. 2011).

149.   In order to establish grounds for denial of a discharge under § 727(a)(2)(B), a
plaintiff must demonstrate by a preponderance of the evidence that there was:

(1) a transfer, removal, destruction, mutilation, or concealment of property;
(2) belonging to the estate;
(3) after the bankruptcy petition was filed; and
(4) performed with an intent to hinder, delay or defraud a creditor or an officer of
the estate.

*A&M Invs., LLC v. Kirtley (In re Kirtley)* 533 B.R. 154, 163 (Bankr. S.D. Miss.
2015); *Schmidt v. Cantu (In re Cantu)*, 2011 WL 672336, at *11 (Bankr. S.D. Tex.
Feb. 17, 2011).

150.   Thus, the first, second and fourth elements are the same as those required under
§ 727(a)(2)(A), while the third element deals with the timing of the disposition and
requires the distinctive element that the challenged transfer or concealment be a
post-bankruptcy event. *Layng v. Pansier* (*In re Pansier*), 613 B.R. 119, 144

**-56-**

(Bankr. E.D. Wis. 2020); *Moore v Sanchez (In re Sanchez)*, 2020 WL 4577113, at *5 (Bankr. D.N.M. Aug. 7, 2020).

151.    The term "concealment" is not defined in the Bankruptcy Code.

152.    The element, utilized under both § 727(a)(2)(A) and (B), ". . .encompasses two elements: (1) a disposition of property, such as concealment [transfer, removal, destruction, or mutilation];  and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property." *Wise v. Wise (In re Wise)*, 590 B.R. 401, 429 (Bankr. E.D. Mich. 2018) (citing *Keeney v. Smith (In re Keeney)* 227 F.3d 679, 683 (6th Cir. 2000).

153.    "Concealment is not confined to physical secretion. It covers other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge owed information."  6 COLLIER ON BANKRUPTCY ¶ 727.02[6][b] at p. 727-27 (16th ed. 2020).

154.    As set forth earlier,[103] it is "beyond dispute" that when a debtor files a bankruptcy case at a time when actions have occurred which potentially trigger an entitlement to a tax refund, her right to receive that refund immediately becomes property of the bankruptcy estate, regardless of the refund actually materializes. *Seaver v. Markey (In re Markey)*, 378 B.R. 594, 604 (Bankr. D. Minn. 2007).

155.    As property of the estate, they [the refunds] were subject to the Trustee's full control and administration; the Debtor had no right to do anything with them or their value."  *Id*. (citing authorities).

156.    It is widely recognized that a plaintiff must demonstrate . . . an <u>actual</u> intent to hinder, delay, or defraud creditors to prevail on a § 727(a)(2) claim — a constructive intent is insufficient.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 384 (Bankr. E.D. Tex. 2009) (citing *Chastant,* 873 F.2d at 91).

157.    "In determining whether the debtor acted with the specific intent required by § 727(a)(2)(B), courts may look to circumstantial evidence, and they generally employ certain well-established indicia of fraudulent intent."  *Irish Bank Resolution Corp., Ltd. v. Drumm (In re Drumm)*, 524 B.R. 329, 408 (Bankr. D. Mass. 2015).

---

[103]  *See supra* conclusions of law 123-129.

158.  Thus, the existence of actual fraud "may be inferred from the actions of the debtor
      and may be proven by circumstantial evidence." *Herman v. Jackson (In re
      Herman)*, 396 F. App'x 108, 110 (5th Cir. 2010) (citing *Chastant*, 873 F.2d at 91);
      *Lowry v. Croft (In re Croft)*, 500 B.R. 823, 852 (Bankr. W.D. Tex. 2013).

159.  Some of the factors that show actual intent to defraud:
      (1) the lack or inadequacy of consideration;
      (2) the family, friendship or close associate relationship between the parties;
      (3) the retention of possession, benefit or use of the property in question;
      (4) the financial condition of the party sought to be charged both before and after
            the transaction in question;
      (5) the existence or cumulative effect of the pattern or series of transactions or
            course of conduct after the incurring of debt, onset of financial difficulties,
            or pendency or threat of suits by creditors; and
      (6) the general chronology of the events and transactions under inquiry.

      *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005).

160.  "One of these factors may be sufficient to find actual fraudulent intent; an
      accumulation of several such factors strongly indicates that the debtor possessed
      the requisite intent." *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 854
      (Bankr. N.D. Tex. 2003), *aff'd*, 108 F. App'x. 993 (5th Cir. 2004).

161.  Additionally, the Fifth Circuit has also recognized that "a presumption of actual
      fraudulent intent necessary to bar a discharge arises when property is either
      transferred gratuitously or is transferred to relatives." *Chastant*, 873 F.2d at 91.

162.  Under that scenario, the presumption of an intent to defraud establishes a *prima
      facie* case for the plaintiff and the burden shifts to the debtor to demonstrate that he
      acted without the requisite intent. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561,
      565 (5th Cir. 2005); *Cadles Grassy Meadows II, LLC v. Passero (In re Passero)*,
      170 F. App'x. 352, 353 (5th Cir. 2006) (citing *Chastant*, 873 F.2d at 91).

163.  Establishing a single omission or misrepresentation under the elements of just one
      sub-section of § 727(a) is sufficient to deny a defendant's discharge. *Hong Kong
      Dev. Corp. v. Phan (In re Dung Anh Phan)*, 607 B.R. 598, 606 (Bankr. S.D. Tex.
      2019).

164.  A debtor's undisclosed receipt and use of $130,000 of pre-petition federal tax
      refunds received after the commencement of his bankruptcy case constituted an
      unlawful post-petition removal of estate property which warranted a denial of the

debtor's discharge pursuant to § 523(a)(2)(B). *Los Alamos Nat'l Bank v. Lamey* (*In re Lamey*), 574 B.R. 240, 248 (Bankr. D.N.M. 2017).

165.    A Chapter 7 debtor's failure to disclose tax refunds he anticipated and subsequently received is a material misrepresentation warranting denial of the discharge, despite the fact that the refund was potentially exempt. *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992).

166.    Though *Mertz* is a false oath case, the principles undergirding the necessity of disclosure, and the impact of a debtor's decision to acquire and consume an estate asset without such disclosure is the same:

> The tax refund was an asset of his estate that Mertz [the debtor] was required to disclose to his creditors. The amount involved-$1358-was not insubstantial. . . . Mertz was required to disclose the refund as part of his estate, and assert any exemption he might have. . . .  The creditors then would be able to evaluate the exemption claim . . . . The successful functioning of the bankruptcy [system] hinges both upon the [debtor's] veracity and his willingness to make a full disclosure.

*Id*.

167.    Because the Plaintiff has established by a preponderance of the evidence that the Defendant engaged in an undisclosed and intentional acquisition and appropriation of the tax refund constituting property of the bankruptcy estate after the filing of her Chapter 7 bankruptcy case with an intent to hinder, delay or defraud a creditor, the entry of a discharge order for the benefit of the Defendant, Hope Renee Keese, is denied pursuant to 11 U.S.C. § 727(a)(2)(B).

*Nondischargeability Under § 523(a)(2)(A):  Debt Arising from False Pretenses, False Representation or Actual Fraud.*

168.    The Plaintiff's Complaint further seeks a determination that the debt owed to it should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

169.    11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an

individual debtor from any debt for money, property, or
services, ... to the extent obtained by false pretenses, a false
representation, or actual fraud, other than a statement
respecting the debtor's or an insider's financial condition.

170.   Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though
other circuits have applied a uniform standard to all § 523(a)(2)(A) actions, the
Fifth Circuit has distinguished the elements of "actual fraud" and of "false
pretenses and false representations." *Pentecost*, 44 F.3d at 1291.

171.   The distinction recognized by the Fifth Circuit appears to be a chronological one,
resting upon whether a debtor's representation is made with reference to a future
event, as opposed to a representation regarding a past or existing fact. *Bercier*, 934
F.2d at 692 [A debtor's promise ... related to a future action which does not
purport to depict current or past fact ... therefore cannot be defined as a false
representation or a false pretense].[104]

172.   Because any representation by the Defendant regarding her future performance of
all obligations arising under the Original Fee Agreement pertained to a future
event, any such statement cannot be properly characterized as a false
representation or a false pretense in this Circuit.

173.   Thus, the validity of the Plaintiff's claim under § 523(a)(2)(A) in this case rests
upon sufficient proof that the debt was obtained by actual fraud.

174.   To have a debt excepted from discharge pursuant to the "actual fraud" provision in
§ 523(a)(2)(A), an objecting creditor must prove that:

(1) the debtor made representations;
(2) at the time they were made the debtor knew they were false;
(3) the debtor made the representations with the intention and purpose to

---

[104]  While "false pretenses" and "false representation" both involve intentional conduct intended
to create and foster a false impression, the distinction is that a false representation involves an express
statement, while a claim of false pretenses may be premised on misleading conduct without an explicit
statement.  *See Wallace v. Davis* (*In re Davis*), 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v.
Copeland* (*In re Copeland*), 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).  In order for a debtor's
representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing
and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other
party."  *Allison*, 960 F.2d at 483; *see Bercier*, 934 F.2d at 692 ["to be a false representation or false
pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that
falsely purport to depict current or past facts"].

deceive the creditor;

(4) the creditor justifiably relied on such representation; and

(5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

175.   It is widely recognized that "[a] promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached." *Allison v. Roberts (In re Allison),* 960 F.2d 481, 484 (5th Cir. 1992).

176.   A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Beshears v. McCool (In re McCool)*, 2019 WL 4781338, at *11 (Bankr. N.D. Tex. Sept. 30, 2019) (citing *Allison*, 960 F.2d at 484).

177.   As one court has summarized,

It is a matter of well-entrenched jurisprudence that a [party's] failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A). Was it otherwise, almost any debt arising out of a failure to complete a contract would be nondischargeable and that is clearly not the way the statute is written or intended. Instead, to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms.

*Strominger v. Giquinto (In re Giquinto)*, 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008).

178.   Because the Court concludes that the Plaintiff failed to demonstrate by a preponderance of the evidence that the indebtedness arising from the Original Fee Agreement was obtained by actual fraud, judgment must be rendered for the Defendant on the Plaintiff's § 523(a)(2)(A) claim regarding the Original Fee Agreement.

179.   In light of its failure to overcome the presumption of unfairness and invalidity under Texas law, thereby rendering the Supplemental Fee Agreement

Case 18-04057   Doc 125   Filed 02/28/21   Entered 02/28/21 17:49:41   Desc Main
Document      Page 62 of 82

unenforceable under Texas law, the Plaintiff is precluded as a matter of law from establishing that the execution of the Supplemental Fee Agreement was fraudulently induced by any allegedly false representation of the Defendant

180.    In light of its failure to overcome the presumption of unfairness and invalidity under Texas law, thereby rendering the Supplemental Fee Agreement unenforceable under Texas law, the Plaintiff is precluded as a matter of law from establishing that the execution of the Supplemental Fee Agreement was the product of actual fraud committed by the Defendant.

181.    Because the Court concludes that the Plaintiff is precluded as a matter of law from claiming that the execution of the Supplemental Fee Agreement was the product of actual fraud committed by the Defendant due to the unenforceability of that Agreement, there is no cognizable claim for nondischargeability due to fraud arising from the contents of the Supplemental Fee Agreement, including all of the permutations involving the Defendant's home and the QDRO Retirement Account, and judgment must be rendered for the Defendant on the Plaintiff's § 523(a)(2)(A) claim regarding the Supplemental Fee Agreement.

*Nondischargeability Under §523(a)(4): Debt Arising from Larceny.*

182.    Larceny is the wrongful taking and carrying away of the property of another with intent to convert such property to the taker's own use *without* the consent of the owner.  *See generally, NF Clean v. Kakal* (*In re Kakal*), 596 B.R. 335, 342 (Bankr. S.D. Tex. 2019); *S&S Food Corp. v. Sherali (In re Sherali)*, 490 B.R. 104, 124 (Bankr. N.D. Tex. 2013).

183.    Larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing.  Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care.  *Minardi,* 536 B.R. at 190; *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

184.    As an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the Texas Theft Liability Act will satisfy the requirements for larceny so as to render a debt nondischargeable under 11 U.S.C. § 523(a)(4). *Sherali,* 490 B.R. at 124; *Drexel Highlander, L.P. v. Edelman (In re Edelman)*, 2014 WL 1796217, at *42 (Bankr. N.D. Tex., May 6, 2014).

185.    Because the Plaintiff failed to establish by a preponderance of the evidence that the

Defendant committed a civil theft arising either from her obligations under the Original Fee Agreement or the unenforceable Supplemental Fee Agreement, thereby precluding a finding that its alleged claim amount was obtained by a larceny committed by the Defendant, judgment must be rendered for the Defendant on its claim brought under § 523(a)(4).

*Defendant's Counterclaim:  Breach of Fiduciary Duty*

186.   The attorney-client relationship gives rise to a fiduciary relationship as a matter of law.  *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005).

187.   "Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations."  *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

188.   "An attorney breaches his fiduciary duty to a client when he, among other things, subordinates his client's interest to his own, engages in self-dealing, fails to disclose conflicts of interest, or makes misrepresentations to achieve these ends."  *McGuire,* 251 S.W.3d at 894.

189.   "The essence of a claim for breach of fiduciary duty focuses on whether an attorney obtained an improper benefit from representing the client."  *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.).

190.   "The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant."  *Anderton v. Cawley*, 378 S.W.3d 38, 51 (Tex. App.—Dallas 2012, no pet.).

191.   "The equitable remedy of fee forfeiture is to protect relationships of trust by discouraging agents' disloyalty."  *Wythe II Corp. v. Stone*, 342 S.W.3d 96, 104 (Tex. App.— Beaumont 2011, pet. denied) (citing *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex.1999)).

192.   "The remedy is restricted to 'clear and serious' violations of duty.  A 'clear' violation occurs if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was

wrongful." *Id.* (citing *Burrow*, 997 S.W.2d at 241) (citations and internal quotations omitted).

193.   "Before a trial court may order fee forfeiture, there must be a finding of a breach of fiduciary duty." *McGuire*, 251 S.W.3d at 897 (citing *Burrow*, 997 S.W.2d at 234).

*Interest and Attorney's Fees*

194.   "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex. 1998) (quoting *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex. 1985)).

195.   There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Id.*

196.   The rationale for this approach as articulated by the Supreme Court of Texas is that a plaintiff is not otherwise fully compensated by the amount of damages sustained at the time of the wrong because he has "been denied the opportunity to invest and earn interest on the amount of damages between the time of the occurrence and the time of judgment." *Cavnar,* 696 S.W.2d at 552.

197.   "Under Texas law, an equitable award of prejudgment interest should be granted to prevailing plaintiff in all but exceptional circumstances." *Meaux Surface Prot., Inc. v. Fogleman,* 607 F.3d 161, 172 (5th Cir. 2010) (citing *Bituminious Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048 (5th Cir. 1996)).

198.   "[T]here is no statute enabling the recovery of prejudgment interest for a breach of contract and warranty." *Enter. Products Operating, LLC v. Trafigura AG*, 2020 WL 7213347, at *11 (Tex. App.—Houston [1st Dist.] Dec. 8, 2020, no pet.).

199.   Under the Texas common law and now under statutory authority as well, pre-judgment interest as damages "begins to accrue on the earlier of 180 days after the date a defendant receives written notice of a claim or the date suit is filed." *In re Xerox Corp.*, 555 S.W.3d 518, 532 (Tex. 2018) (citing *Johnson & Higgins*, 962 S.W.2d at 531).

200.   "In addition, the Texas Supreme Court has expressly held that when prejudgment interest is awarded based on common law equitable principles, a trial court may

not reduce or eliminate a plaintiff's prejudgment interest award because of delays caused by either party in resolving a case; this is true even if the trial court believes the plaintiff may have engaged in dilatory tactics or acted in bad faith in preventing a timely resolution of the lawsuit.  *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 513 (Tex. App.—El Paso 2018, no pet.) (citing *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)).

201.   "Prejudgment interest is governed by Texas law and the Plaintiff is entitled to the rate specified in the contract.  However, for post-judgment interest, the federal post-judgment interest statute applies.  *DP Solutions, Inc. v. Rollins, Inc*., 353 F.3d 421, 435 (5th Cir. 2003);  28 U.S.C. § 1961(a).

202.   The Original Fee Agreement between the parties provides for the accrual of interest at 14% per annum.[105]

203.   In the absence of proof of any written notice of the claim issued by the Plaintiff to the Defendant, accrual of pre-judgment interest on actual damages shall begin on the date of the filing of the petition in the state court lawsuit by and among these parties—March 26, 2018.

204.   Thus, the Plaintiff is entitled to a recovery of pre-judgment interest from the Defendant through February 28, 2021, in the amount of $42,710.83.

205.   "A breach of contract cannot support recovery of exemplary damages."  *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *Correct RX Pharmacy Services, Inc. v. Cornerstone Automation Sys., L.L.C.*, 945 F.3d 423, 428 (5th Cir. 2019) (citing *Reed*).

206.   Thus, since the Plaintiff did not prevail on its tortious conduct theories, the Plaintiff's request for an award of exemplary damages must be denied.

207.   Both parties seek an award of attorney's fees which were submitted pursuant to the directive of the Court at the conclusion of the trial.

208.   On January 15, 2021, the Plaintiff filed its "Plaintiff's Supplemental Attorney's Fees Evidence" (the "Plaintiff's Fee Motion"), composed of the declaration of David Urteago, accompanied by the Plaintiff's fee exhibits, which are collectively marked as Plaintiff's Exhibit 40 and are hereby admitted by the Court.

---

[105]  Ex. 3 at 4.

209.    No objection was filed to the Plaintiff's Fee Motion.

210.    On January 15, 2021, the Defendant filed the "Defendant's Motion for Attorney's Fees" (the "Defendant's Fee Motion"), composed of the declaration of John P. Lewis, Jr., accompanied by the Defendant's various fee exhibits, all of which are hereby admitted into evidence as Def's Ex. X.

211.    The Plaintiff filed an amended objection to the Defendant's Fee Motion on January 22, 2021, composed of the "Supplemental Attorney's Fees Declaration of David Urteago" which is marked as Plaintiff's Exhibit 41 and which is hereby admitted by the Court.

212.    The Defendant filed a reply to the Plaintiff's Objection on January 25, 2021.

213.    In adherence to the so-called "American Rule," attorneys' fees are not taxable as costs or recoverable as damages in an adversary proceeding unless such fees are authorized by statute or through an enforceable contract between the parties. *Baker Botts LLP v. Asarco, LLC,* 576 U.S. 121, 126 (2015).

214.    The Plaintiff is the prevailing party under its complaint on the following causes of action:  (1) its claim for denial of discharge under § 727(a)(2)(B); (2) its claim for the Defendant's breach of the Original Fee Agreement.

215.    The Plaintiff is the prevailing party on its defense of the Defendant's counterclaim for breach of fiduciary duty.

216.    The Defendant is the prevailing party on its defense of the following causes of action under the Plaintiff's complaint:  (1)  the state law fraud claims; (2) the claim for liability under the Texas Theft Liability Act; (3) the claim for denial of discharge under § 727(a)(2)(A); (4) the nondischargeability claim for fraud under § 523(a)(2)(A); and (5) the nondischargeability claim for larceny under § 523(a)(4).

217.    As for attorney's fees in § 727 actions, the Bankruptcy Code "does not provide a statutory basis for such a recovery and there is sound authority that precludes an award of attorneys' fees in this context." *First United Bank & Trust Co. v. Buescher* (*In re Buescher*), 491 B.R. 419, 439 (Bankr. E.D. Tex. 2013), subsequently *aff'd,* 783 F.3d 302 (5th Cir. 2015) (citing *Tuloil, Inc. v. Shahid (In re Shahid),* 254 B.R. 40, 44 (B.A.P. 10th Cir. 2000); *Cole Taylor Bank v. Yonkers (In re Yonkers)*, 219 B.R. 227, 234 (Bankr. N.D. Ill. 1997).

218.   As the 10th Circuit BAP observed:

> An action under § 727 does not liquidate the debt, nor does it
> give the plaintiff a judgment on its claim.  Moreover, an
> action under § 727 may result in a total denial of discharge,
> placing every creditor in the position of being able to pursue
> collection of debts, both liquidated and unliquidated.  The
> creditor that seeks such relief under §727, relief that
> ultimately inures to all creditors, does not gain any special or
> particularized benefit; it cannot liquidate its debt or obtain a
> judgment on its debt in an action under § 727.  That creditor
> cannot use an attorney's fee clause in its contract with the
> debtor to recover attorney's fees in an action under § 727
> because it is not an action on its contract.

254 B.R. at 44.

219.   "Thus, there is no basis in the Code, the Rules, or relevant case law which suggests
prevailing party attorneys' fees should be awarded in an action under § 727." *Banner Bank v. Wyatt* (*In re Wyatt*), 609 B.R. 530, 535 (Bankr. D. Idaho 2019).

220.   Accordingly, no fees will be awarded to either party arising from the determination
of the § 727(a) causes of action.

221.   With regard to the Plaintiff's breach of contract claim, "[C]hapter 38 of the Civil
Practices and Remedies Code allows recovery of attorney's fees in breach of
contract cases:  'A person may recover reasonable attorney's fees ... in addition to
the amount of a valid claim and costs, if the claim is for ... an oral or written
contract.'"  *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660,
666 (Tex. 2009); 2B TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West
2020)).

222.   "To recover attorney's fees under Chapter 38: (1) the claimant must be represented
by an attorney; (2) the claimant must present the claim to the opposing party or a
duly authorized agent of the opposing party; and (3) payment for the just amount
owed must not have been tendered before the expiration of the thirtieth day after
the claim is presented.  *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d
167, 186 (Tex. App.—Houston  [1st Dist.] 2018, no pet.) (citing statute now found
at 2B TEX. CIV. PRAC. & REM. CODE ANN. § 38.002 (West 2020)).

223.   The Plaintiff has fulfilled all three statutory prerequisites in establishing its right to

a recovery of attorney's fees from the Defendant for her breach of the Original Fee Agreement.

224.   A party seeking to recover attorney's fees has the burden to show that the fees were reasonable and necessary, which, among other things, requires the party to show the fees were incurred on a claim that allows recovery of such fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10–11 (Tex.1991).

225.   Factors to consider in determining the reasonableness of attorney's fees under Texas law include: (1) the time and labor required and difficulty of the issues involved; (2) the likelihood that acceptance of the employment will preclude other employment by the lawyer; (3) the fees customarily charged in the locality for similar legal services; (4) the amount involved and results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer performing the services; and (8) whether the fee is fixed or contingent on the result obtained. *McGuire,* 251 S.W.3d at 898 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997)).

226.   These Texas factors essentially reflect the "Johnson" factors which are routinely utilized by this Court in determining the reasonableness of attorney's fees, after calculation of the "lodestar" amount. See *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

227.   However, not all attorney's fees can be recovered by a prevailing party.

228.   For example, as applicable to the current dispute, "[a] prevailing party on a breach of fiduciary duty claim generally may not recover attorney's fees against an adversary to the claim." *DeNucci v. Matthews*, 463 S.W.3d 200, 209 (Tex. App.—Austin 2015, no pet.) (citing *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex.1964)).

229.   Accordingly, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006)

230.   Under Texas law, when legal services advance two categories of claims:  (1) those for which the recovery of fees is permitted and (2) those for which the recovery of fees is not permitted, "the party must segregate and exclude the fees for services related to the claims for which fees are not recoverable unless the discrete legal services advanced [d] both [the] recoverable claim and the unrecoverable claim."

*Brinson Benefits, Inc. v. Hooper*, 501 S.W.3d 637, 645 (Tex. App.—Dallas 2016, no pet.) (citing *Chapa*, 212 S.W.3d at 313–14).

231. 'Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006)

232. The need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Chapa*, 212 S.W.3d at 312–13.

233. When the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Brinson Benefits*, 501 S.W.3d at 645; *Turner v. Ewing*, 2020 WL 6878681, at *10 (Tex. App.—Houston [14th Dist.] Nov. 24, 2020, no pet.).

234. The legal services documented in the Plaintiff's Fee Motion were rendered by two firms, Urteago, P.C. ("Urteago") and Pronske & Kathman, P.C. ("Kathman").

235. Urteago's involvement in seeking recovery of the Plaintiff's breach of contract claim began with the filing of the Plaintiff's state court lawsuit against the Defendant.

236. Urteago has rendered 262.57 hours of legal services at an hourly rate of $250/hour.

237. The requested lodestar calculation for Urteago's services is $65,642.50.

238. The services rendered by Urteago were reasonable and necessary except as set forth herein.

239. A reduction of 9.21 attorney hours is justified for services rendered by Urteago regarding injunctive relief in the state court proceeding based upon rights arising from the unenforceable Supplemental Fee Agreement.

240. A reduction of 15.04 attorney hours is justified for services rendered by Urteago in which excessive time was billed for the work described or were for services which were not justifiably warranted in pursuit of the Plaintiff's breach of contract claim.

241. The revised lodestar calculation for Urteago's services is $59,580.00.

242.   No enhancement nor deduction of the revised lodestar calculation is warranted under the *Arthur Andersen* factors.

243.   The Plaintiff has properly recognized the need for segregation of services with regard to the Plaintiff's Fee Motion.

244.   The Plaintiff has voluntarily deducted the sum of $10,341.19 for services rendered by Urteago in pursuit of the Plaintiff's § 727 claims for which a fee recovery is not authorized.[106]

245.   The Plaintiff further implemented a 10% discount for services by Urteago which were "mixed" with § 727 services,[107] resulting in a voluntary deduction of $2,288.72.

246.   The Plaintiff asserts that the remaining services by Urteago "were either not connected to the objections asserted under § 727 or were for legal tasks that entirely advanced both recoverable and unrecoverable claims and therefore no segregation was necessary."[108]

247.   It must be acknowledged that the Plaintiff tendered its Plaintiff's Fee Motion without knowledge of the trial result.

248.   Without such knowledge, the Plaintiff's Fee Motion seeks recovery of all of the remaining fee requests attributable to Urteago.

249.   No objection was filed to the Plaintiff's proposed adjustment.

250.   In light of the result announced herein, under which the breach of contract was the sole cause of action on which the Plaintiff prevailed that permits the recovery of attorney's fees, the Court has endeavored to identify those matters that are outside the scope of the contract claim and which are not so "intertwined to the point of being inseparable" with that claim.

251.   After the lodestar adjustments by the Court and the voluntary deduction of § 727-related services, the Plaintiff seeks recovery of the remaining $49,238.81 outlined

---

[106]  These services were highlighted in yellow in the exhibits to the Plaintiff's Fee Motion.

[107]  These services were highlighted in blue in the exhibits to the Plaintiff's Fee Motion.

[108]  Ex. 40 at 17-18.

in its Fee Motion based upon all other asserted claims except its § 727 claims.[109]

252.   The Plaintiff's request for full recovery of services pertaining to its defense of the counterclaim for breach of fiduciary duty brought by the Defendant is denied.

253.   "A prevailing party on a breach of fiduciary duty claim generally may not recover attorney's fees against an adversary to the claim." *DeNucci v. Matthews*, 463 S.W.3d 200, 209 (Tex. App.—Austin 2015, no pet.) (citing *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex.1964)).

254.   While some degree of overlap exists between its affirmative contractual claim and its defense against the Defendant's counterclaim, the differentiation between the enforceable Original Fee Agreement and the unenforceable Supplemental Fee Agreement erodes some of that commonality, such that services rendered for the Plaintiff to secure its breach damages had little to do with the successful defense of the counterclaim.

255.   The successful defense of the counterclaim was primarily achieved by the application of the presumption of unfairness or invalidity arising under Texas law against the effectiveness of the Supplemental Fee Agreement—a position not addressed at all by the Plaintiff—and for which, in fact, the Plaintiff was not really responsible since it was diametrically opposed by the position actually advocated by the Plaintiff.

256.   In light of these complexities, any compensable overlap between the breach of contract services and the Plaintiff's successful "defense" of the counterclaim is best handled by the application of a discount amount as opposed to a blanket authorization for recovery of those amounts.

257.   Such discrete legal services were not so intertwined so as to relieve the Plaintiff of its segregation duties.

258.   The Court finds that the value of all remaining services should be discounted by 20% as a reasonable segregation adjustment to exclude those services rendered by Urteago that are not within the scope of the Plaintiff's breach of contract claim or inseparable therefrom.

---

[109]   That total reflects a restoration of the 10% discount which the Plaintiff voluntarily imposed regarding "mixed" § 727 claims.

259. An additional $9,847.76 reduction to the Urteago portion of the Plaintiff's Fee Motion is therefore warranted.

260. The Plaintiff is therefore allowed a recovery of $39,391.05 attributable to the Urteago portion of the Plaintiff's Fee Motion, together with expense reimbursements totaling $162.23, for a total of $39,553.28.

261. Kathman's involvement in seeking recovery of the Plaintiff's breach of contract claim began with the filing of the Defendant's bankruptcy case and the initiation of this adversary proceeding.

262. The Plaintiff's Fee Motion reveals that Kathman has rendered 41.2 attorney hours at a hourly rate of $385/hour and 5.6 paraprofessional hours at an hourly rate of $120/hour for the Plaintiff in this case.

263. The requested lodestar calculation for Kathman's services is $16,534.00.

264. The services rendered by Urteago were reasonable and necessary except as set forth herein.

265. This adversary proceeding did not encompass any effort by Kathman regarding the breach of contract claim until the time period immediately preceding the filing of the Second Amended Complaint.

266. A reduction of 10.5 attorney hours and 3.6 paraprofessional hours is justified for services rendered by Kathman which did not address the breach of contract claim.

267. The revised lodestar calculation for Kathman's services is $12,059.50.

268. No enhancement nor deduction of the revised lodestar calculation is warranted under the *Arthur Andersen* factors.

269. As for the Kathman portion of its Fee Motion, the Plaintiff has voluntarily deducted the sum of $192.50 for services rendered by Kathman in pursuit of the Plaintiff's § 727 claims for which a fee recovery is not authorized.[110]

270. The Plaintiff further implemented a 10% discount for services by Kathman which were "mixed" with § 727 services,[111] resulting in a voluntary deduction of $654.95.

---

[110] These services were highlighted in yellow in the exhibits to the Plaintiff's Fee Motion.

[111] These services were highlighted in blue in the exhibits to the Plaintiff's Fee Motion.

271.    The Plaintiff asserts that the remaining services by Kathman "were either not connected to the objections asserted under § 727 or were for legal tasks that entirely advanced both recoverable and unrecoverable claims and therefore no segregation was necessary."[112]

272.    Without knowledge of the trial result, the Plaintiff's Fee Motion seeks recovery of all of its remaining fee requests attributable to Kathman.

273.    No objection was filed to the Plaintiff's proposed adjustment.

274.    In light of the result announced herein, under which the breach of contract was the sole cause of action on which the Plaintiff prevailed that permits the recovery of attorney's fees, the Court has endeavored to identify those matters that are outside the scope of the contract claim and which are not so "intertwined to the point of being inseparable" with that claim.

275.    After the lodestar adjustments by the Court and the voluntary deduction of § 727-related services, the Plaintiff seeks recovery of the remaining $11,867.00 outlined in its Fee Motion based upon all other asserted claims except its § 727 claims.[113]

276.    The Court finds that the value of all remaining services should be discounted by 20% as a reasonable segregation adjustment to exclude those services rendered by Kathman that are not within the scope of the Plaintiff's breach of contract claim or inseparable therefrom.

277.    An additional $2,373.40 reduction to the Kathman portion of the Plaintiff's Fee Motion is therefore warranted.

278.    The Plaintiff is therefore allowed a recovery of $9,493.60 attributable to the Kathman portion of the Plaintiff's Fee Motion together with expense reimbursements totaling $760.12, for a total of $10,253.72.

279.    The Plaintiff's request for the award of conditional appellate fees is denied.

280.    In the Fifth Circuit, the "issue of appellate attorney's fees is a matter for the [trial] court following the resolution of an appeal." *Instone Travel Tech Marine &*

---

[112]  Ex. 40 at 17-18.

[113]  That total reflects a restoration of the 10% discount which the Plaintiff voluntarily imposed regarding "mixed" § 727 claims.

*Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 433 (5th Cir. 2003).

281. As the Fifth Circuit recently stated, "[A]lthough we have the authority to award such fees, our preferred procedure is to remand for the determination of the amount of such an award.  We have employed this preferred procedure quite recently." *Zimmerman v. City of Austin, Tex.*, 969 F.3d 564, 571 (5th Cir. 2020) (citing *Instone*, 334 F.3d at 433).

282. The Plaintiff is entitled to recover the sum of $49,807.00 as an award of reasonable attorney's fees and expense reimbursements from the Defendant pursuant to its contractual rights under the Original Fee Agreement.

283. The Court now turns to the Defendant's Fee Motion.

284. Now that the Defendant has successfully defended the § 523 claims asserted by the Plaintiff, the Defendant seeks an award of attorney's fees under § 523(d) of the Bankruptcy Code.

285. Section 523(d) of the Bankruptcy Code provides that:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C.  § 523(d)

286. The purpose of this provision "is to discourage creditors from bringing objectively weak [nondischargeability] litigation in the hopes of extracting a settlement from a debtor anxious to avoid paying attorney's fees to defend the action." *McComb Fin., Inc. v. Webster* (*In re Webster*), 573 B.R. 653, 662 (Bankr. S.D. Miss. 2017) (citing 4 COLLIER ON BANKRUPTCY ¶ 523.08[8] (16th ed. 2016)).

287. "In the absence of section 523(d), the threat of litigation over the discharge exception of section 523(a)(2) and the attendant costs of litigation could induce debtors to settle for a reduced sum.  Thus, creditors with marginal cases could compel at least part of their claims to be excepted from discharge or reaffirmed, despite the weakness of their cases." *Id.*

288.  Section 523(d) "requires the debtor to initially establish that: (1) the creditor
      requested a determination that the debt in question was excepted from discharge
      under § 523(a)(2); (2) the debt in question was a consumer debt; and (3) the debt
      was in fact discharged." *Dains v. Dains* (*In re Dains*), 384 B.R. 241, 253 (Bankr.
      W.D. Mo. 2008)

289.  "Once the debtor establishes these three elements, the burden then shifts to the
      creditor to demonstrate that its position was substantially justified in initiating the
      adversary proceeding or that special circumstances are present that would make
      the award of attorney's fees and costs unjust." *Id*.

290.  In order to grant a § 523(d) award,

          The court need not find that the plaintiff acted in bad faith or
          acted frivolously before fees and costs may be awarded. The
          court must only make the determination that the plaintiff
          proceeded past a point where it knew, or should have known,
          that it could not carry its burden of proof. "Substantially
          justified" has been interpreted to require that the
          plaintiff-creditor had a reasonable basis both in fact and in
          law to bring and pursue its nondischargeability action.

      *Eric D. Fein, P.C. & Assoc. v. Young* (*In Re Young*) 2010 WL 795113, at *2
      (Bankr. E.D. Tex. Mar. 8, 2010) (quoting *AT&T Universal Card Servs., Inc. v.
      Nguyen* (*In re Nguyen*), 235 B.R. 76, 91 (Bankr.N.D.Cal.1999)).

291.  The award of attorney's fees under § 523(d) is within this Court's sound discretion.
      *Id*.

292.  The Defendant has failed to demonstrate that "the debt was in fact discharged"
      because the entry of a discharge order for the benefit of the Defendant has been
      denied.

293.  The Plaintiff further possessed a reasonable basis in fact and in law to seek its
      determination of nondischargeability.  Its efforts were simply unsuccessful.

294.  Accordingly, the Defendant's request for a recovery of attorney's fees under
      § 523(d) of the Bankruptcy Code is denied.

295.  The Defendant further seeks an award of attorney's fees as the prevailing party on
      the Plaintiff's asserted claim under the Texas Theft Liability Act ("TTLA").

296.   Under the TTLA, "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." 6 TEX. PRAC. & REM. CODE ANN. § 134.005(b) (West 2019)

297.   The Texas Supreme Court has specifically held that "the Texas Theft Liability Act's provision for the award of attorney's fees to each prevailing person applies both to plaintiffs and defendants who prevail." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 148 (Tex. 2019).

298.   When a plaintiff's civil theft claim is resolved in favor of a defendant with prejudice to the plaintiff's claim, "whether on the merits or for some other reason," that defendant is a "prevailing party" with respect to that claim. *Id.* (citing *Epps v. Fowler*, 351 S.W.3d 862, 868 (Tex. 2011)).

299.   "A defendant who defeats a TTLA claim is a prevailing party and can recover attorney's fees even if it did not recover actual damages." *Int'l Med. Ctr. Enters. Inc. v. ScoNet, Inc.*, 2017 WL 4820347, at *16 (Tex. App.—Houston [1st Dist.] Oct. 26, 2017, no pet.).

300.   "The Theft Act is unusual in Texas law in that it requires the court to award attorney's fees to a party who successfully defends a Theft Act claim, without any prerequisite that the claim is found to be groundless, frivolous, or brought in bad faith." *Air Routing Intern. Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 686 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

301.   Because "the parties' legal relationship has changed in a manner that materially benefited" the defendant, a dismissal of a TTLA claim with prejudice for want of prosecution qualified the defendant as a prevailing party and entitled it to recover attorney's fees under the TTLA, even when the prejudicial effect was erroneously applied without challenge. *Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 705–06 (Tex. App.—Hous. [1st Dist.] 2014, no pet.).

302.   "A person who prevails in a TTLA cause of action is entitled to recover the reasonable fees necessarily incurred prosecuting or defending that cause of action, even if the party is unsuccessful on other claims and counterclaims litigated in the same suit." *Id.* at 706.

303.   The Fifth Circuit has been equally diligent in applying the TTLA in this manner when a TTLA claim is adjudicated in favor of any party in federal court. It has directed that:

the prevailing party on a Texas Theft Liability Act claim
"shall" receive attorneys' fees. Attorneys' fees are mandatory
under [this] statute[]. A prevailing party is one that receives
affirmative judicial relief. A zero on damages necessarily
zeros out "prevailing party" status. For purposes of the Texas
Theft Liability Act, however, a prevailing party includes a
successful defendant, *regardless of his success on other
claims in the suit.*

*Merritt Hawkins & Associates, L.L.C. v. Gresham*, 861 F.3d 143, 155–56 (5th Cir.
2017) (emphasis added).

304.    The Defendant is the prevailing party on the resolution of the Plaintiff's TTLA
        claim and is entitled to a recovery of attorney's fees under § 134.005(b) of the
        Texas Civil Practice and Remedies Code

305.    The legal services documented in the Defendant's Fee Motion were rendered by
        John P. Lewis, Jr. ("Lewis"), first as a solo practitioner and, since March 1, 2020,
        as a member of Hayward, PLLC ("Hayward").

306.    Lewis's involvement in the Defendant's defense against the TTLA claim brought
        by the Plaintiff in this case began with the initiation of this adversary proceeding.
        Lewis did not represent the Debtor-Defendant in the underlying bankruptcy case.

307.    The Defendant's Fee Motion reveals that Lewis and Hayward have rendered
        215.26 attorney hours at a hourly rate of $300/hour, 42.8 attorney hours at an
        hourly rate of $450/hour, 11 junior attorney hours at an hourly rate of $195/hour,
        and 5.9 paraprofessional hours at an hourly rate of $175/hour for the Defendant in
        this case.

308.    The requested lodestar calculation for the services of Lewis and Hayward is
        $87,000.50.[114]

309.    The services rendered by Lewis and Hayward were reasonable and necessary
        except as set forth herein.

310.    A reduction of 5.25 attorney hours [@$300/hr.] is justified for services rendered
        by Lewis in which excessive time was billed for the work described or services

---

[114]  This figure corrects a minor arithmetic error in the Motion.

-77-

were so batched or lumped together in a singular time entry that the Court was precluded from evaluating the reasonableness and necessity of each of the particular services contained in that entry.

311.   The revised lodestar calculation for Lewis and Hayward is $85,425.50.

312.   No enhancement nor deduction of the *revised* lodestar calculation is warranted under the *Arthur Andersen* factors.

313.   The Defendant has voluntarily deducted the sum of $12,042.00 for services rendered by Lewis and Hayward in defense of the Plaintiff's § 727 claims for which a fee recovery is not authorized.[115]

314.   The Defendant asserts that the remaining services by Lewis and Hayward defending the Defendant from fraud claims under § 523(a)(2)(A) are:

>        intertwined and inseparable from services and tasks counsel performed in respect of Plaintiff's claims under the Theft Liability Act and the Plaintiff's objection (sic) to discharge of such claims under Section 523(a)(4) of the Bankruptcy Code. Whether Debtor stole Plaintiff's legal services or whether she defrauded Plaintiff in providing those services required [Defendant's] counsel to perform and provide the same tasks and services – they both turned on Debtor's intentions and conduct when she signed the amended fee agreement that was unenforceable, invalid, and illegal.  The factual and legal basis for both types of claims and discharge objections (sic) are therefore virtually identical and services performed for one type of claim or objection benefited the other type of claim or objection as well.[116]

315.   Without knowledge of the trial result, the Defendant's Fee Motion seeks recovery of all of its remaining fee requests attributable to the services rendered by Lewis and Hayward.

316.   The Plaintiff objected to the limited segregation of fees contained in the Defendant's Fee Motion.

---

[115]  These services were highlighted in yellow in the exhibits to the Defendant's Fee Motion.

[116]  *Defendant's Fee Motion* at 10-11.

317. The Plaintiff asserted certain services needed to be segregated because they relate to unrecoverable claims in the fee award context (the "Green Deductions").[117]

318. The Plaintiff asserted other services should be discounted as a means to avoid awarding attorney's fees on unrecoverable claims (the "Pink Deductions").[118]  The Plaintiff asserts that a 58.33% discount should be applied to those partially-intertwined services.[119]

319. The Defendant replied to that objection by contending that the Texas rules on segregation are not applicable in this context.

320. However, when Texas law is supplying the rule of decision, such as this issue in applying the mandatory nature of attorney's fee awards under the TTLA, the Texas segregation standards are applicable. *Merritt,* 861 F.3d at 155–56.  See also, *In re Mud King Products, Inc.*, 525 B.R. 43, 56 (Bankr. S.D. Tex. 2015); *Walser v. Tex. Music Group, Inc.* (*In re Antone's Records, Inc.*), 445 B.R. 758, 789 (Bankr. W.D. Tex. 2011).

321. As to Plaintiff's assertion that certain services needed to be segregated because they relate to unrecoverable claims, the objection is sustained to the degree that 0.75 of an attorney hour is reduced [@$300/hr] and 16 hours [@$300/hr] will be subjected to a discount to address application to unrecoverable claims.

322. The Plaintiff's calculation of its proposed discount to be applied to the Defendant's intertwined claims is flawed.[120]  Some of the causes of action cancel each other and others overlap to a substantial degree.

323. Further, to the degree that it seeks a substantial discount as a segregation tool, that is precluded by the Plaintiff's improper amalgamation of the contract and fraud claims, specifically under the auspices of the TTLA.

---

[117] Ex. 41 at 3.  These services were highlighted in green by the Plaintiff in the exhibits attached to the Defendant's Fee Motion.

[118] *Id.*  These services were highlighted in pink by the Plaintiff in the exhibits attached to the Defendant's Fee Motion.

[119] Ex. 41 at 4.  Given the similarity of the claim categories, the applicable fraction in the analysis should be ⅓, not the 7/12 proffered by the Plaintiff.

[120] *Id.*

324.   The Plaintiff's effort to frame a breach of contract as a civil theft of property or theft of services under the TTLA was primarily responsible for the current difficulty in attempting to separate legal services relating to the contract from those directly recoverable under the TTLA.

325.   The Plaintiff sought that confluence even with reference to the Original Fee Agreement, impotently arguing without evidence that the Defendant had a fraudulent intent regarding the payment of legal services from the inception of the attorney-client relationship with the Plaintiff.

326.   In light of the increased difficulty of separating those legal services pertaining to the contract between the parties and the resulting TTLA claims asserted by the Plaintiff, a higher degree of contractually-related legal services are "intertwined to the point of being inseparable" with services related to the defense of the TTLA claim.

327.   After the lodestar adjustments by the Court and the voluntary deduction of § 727-related services, the Plaintiff seeks recovery of the remaining $73,383.50 outlined in its Fee Motion based upon all other asserted claims except its § 727 claims.

328.   The Plaintiff's demand for the "Green Deductions" in its objection to the Defendant's Fee Motion will be sustained in part and a deduction of $2,625.50 shall be applied for services that relate to the Defendant's counterclaim, its second motion to dismiss, and its objections to the Plaintiff's summary judgment motions.

329.   The "Pink Claims" to be subjected to an appropriate discount factor as a means to avoid awarding attorney's fees on unrecoverable claims, as set forth in the Plaintiff's objection to the Defendant's Fee Motion, total $51,902.09.[121]

330.   The value of all remaining intertwined services, totaling $51,902.09, should be discounted by 33.33% as a reasonable segregation adjustment to exclude those services rendered by Lewis and Hayward that are not within the scope of the Defendant's defense of the Plaintiff's TTLA claim or are inseparable therefrom.

331.   Combining the two deductions granted as a result of the Plaintiff's objections, an additional $19,924.24 reduction to the Defendant's Fee Motion is therefore warranted.

---

[121]   That total reflects the lodestar adjustment by the Court as well as a transfer of an additional 16 hours from the "green" category sought to be excluded entirely to the "pink" category of services to which a discount shall be applied.

332.   The Defendant is therefore entitled to recover from the Plaintiff the sum of
$53,459.26 as an award of reasonable attorney's fees to the prevailing party
pursuant to the Texas Theft Liability Act, codified as § 134.005(b) of the Texas
Civil Practice and Remedies Code.

333.   The Defendant's Fee Motion also seeks the recovery of $973.05 in litigation-
related expenses.

334.   A prevailing party  in a suit under the Texas Theft Liability Act has the right to
recover "court costs and reasonable and necessary attorneys' fees."  *Int'l. Paper
Co. v. Frame*, 67 F. App'x. 251, 2003 WL 21195497, at *6 (5th Cir. 2003); 6 TEX.
PRAC. & REM. CODE ANN. § 134.005 (West 2019).

335.   "Recoverable court costs include: deposition costs, filing fees, court reporter fees,
transcripts, and subpoena/citation fees."  *NF Clean v. Kakal* (*In re Kakal*), 2019
WL 2895908, at *3 (Bankr. S.D. Tex. July 2, 2019).

336.   However, general litigation expenses such as "delivery services, such as Federal
Express; travel; long-distance phone calls; bond premiums; postage; reproduction
expense; binding of brief[s] ... office air conditioning, and secretarial overtime" are
outside the scope of recovery under the TTLA.  *Id.*

337.   Accordingly, the Defendant is entitled to a reimbursement of costs for the
Plaintiff's deposition in the amount of $944.55.  All other requested expense
reimbursements by the Defendant are denied.

338.   Post-judgment interest begins to accrue on an attorney's fee award on the date of
the judgment allowing recovery of attorney's fees and runs until the date the fees
are paid in full.  *Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 545 (5th
Cir.1983) (*en banc*) (*per curiam*), *overruled in part on other grounds by Int'l
Woodworkers of Am. v. Champion Int'l Corp.* 790 F.2d 1174 (5th Cir.1986), *aff'd.
sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494,
96 L.Ed.2d 385 (1987)); *Eaves v. County of Cape May*, 239 F.3d 527, 527–28 (3d
Cir. 2001); *DMM Group, Inc. v. Hanna* (*In re Hanna*), 603 B.R. 571, 600 (Bankr.
S.D. Tex. 2019).

*Award of Judgment*

339.   The entry of a discharge in favor of the Defendant-Debtor, Hope Renee Keese,
shall be denied pursuant to 11 U.S.C. § 727(a)(2)(B).

340. The Plaintiff, The Barbknecht Firm, P.C., is entitled to recover from the Defendant, Hope Renee Keese, the principal sum of $104,247.00, plus pre-judgment interest in the amount of $42,710.83, and a recovery of attorneys' fees in the amount of $49,807.00, for a total of $195,842.48, together with any further court costs assessed by the Court, and post-judgment interest upon all such sums at the current federal post-judgment interest rate of 0.07% until paid.

341. The Defendant, Hope Renee Keese, as the prevailing party on the claim brought by the Plaintiff under the Texas Theft Liability Act, is entitled to recover from the Plaintiff, The Barbknecht Firm, P.C., an award of attorney's fees in the amount of $54,459.26, and recovery of court costs in the amount of $944.55, for a total of $55,403.81 pursuant to § 134.005(b) of the Texas Theft Liability Act, 6 TEX. PRAC. & REM. CODE ANN. § 134.005(b) (West 2019), together with post-petition interest upon such sum at the current federal post-judgment interest rate of 0.07% until paid.

342. All other relief requested that all other relief requested in the Fourth Amended Complaint filed by the Plaintiff, The Barbknecht Firm, P.C., in the above-referenced adversary proceeding shall be denied.

343. All relief requested in the Counterclaim filed by the Defendant and Counter-Plaintiff, Hope Renee Keese, in the above-referenced adversary proceeding shall be denied.

344. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

345. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 02/28/2021

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE